(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RUCHO ET AL. *v.* COMMON CAUSE ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 18–422.   Argued March 26, 2019—Decided June 27, 2019*

Voters and other plaintiffs in North Carolina and Maryland filed suits challenging their States' congressional districting maps as unconstitutional partisan gerrymanders.  The North Carolina plaintiffs claimed that the State's districting plan discriminated against Democrats, while the Maryland plaintiffs claimed that their State's plan discriminated against Republicans.  The plaintiffs alleged violations of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Elections Clause, and Article I, §2.  The District Courts in both cases ruled in favor of the plaintiffs, and the defendants appealed directly to this Court.

*Held*: Partisan gerrymandering claims present political questions beyond the reach of the federal courts.  Pp. 6–34.

   (a) In these cases, the Court is asked to decide an important question of constitutional law.  Before it does so, the Court "must find that the question is presented in a 'case' or 'controversy' that is . . . 'of a Judiciary Nature.'"  *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 342.  While it is "the province and duty of the judicial department to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177, sometimes the law is that the Judiciary cannot entertain a claim because it presents a nonjusticiable "political question," *Baker* v. *Carr*, 369 U. S. 186, 217.  Among the political question cases this Court has identified are those that lack "judicially discoverable and manageable standards for resolving [them]."  *Ibid.*  This Court's partisan gerrymandering cases have left unresolved the question whether such claims are claims of *legal* right, resolvable according to *legal* princi-

————

*Together with No. 18–726, *Lamone et al.* v. *Benisek et al.*, on appeal from the United States District Court for the District of Maryland.

ples, or political questions that must find their resolution elsewhere. See *Gill* v. *Whitford*, 585 U. S. ___, ___.

Partisan gerrymandering was known in the Colonies prior to Independence, and the Framers were familiar with it at the time of the drafting and ratification of the Constitution. They addressed the election of Representatives to Congress in the Elections Clause, Art. I, §4, cl. 1, assigning to state legislatures the power to prescribe the "Times, Places and Manner of holding Elections" for Members of Congress, while giving Congress the power to "make or alter" any such regulations. Congress has regularly exercised its Elections Clause power, including to address partisan gerrymandering. But the Framers did not set aside all electoral issues as questions that only Congress can resolve. In two areas—one-person, one-vote and racial gerrymandering—this Court has held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts. But the history of partisan gerrymandering is not irrelevant. Aware of electoral districting problems, the Framers chose a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress, with no suggestion that the federal courts had a role to play.

Courts have nonetheless been called upon to resolve a variety of questions surrounding districting. The claim of population inequality among districts in *Baker* v. *Carr*, for example, could be decided under basic equal protection principles. 369 U. S., at 226. Racial discrimination in districting also raises constitutional issues that can be addressed by the federal courts. See *Gomillion* v. *Lightfoot*, 364 U. S. 339, 340. Partisan gerrymandering claims have proved far more difficult to adjudicate, in part because "a jurisdiction may engage in constitutional political gerrymandering." *Hunt* v. *Cromartie*, 526 U. S. 541, 551. To hold that legislators cannot take their partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. The "central problem" is "determining when political gerrymandering has gone too far." *Vieth* v. *Jubelirer*, 541 U. S. 267, 296 (plurality opinion). Despite considerable efforts in *Gaffney* v. *Cummings*, 412 U. S. 735, 753; *Davis* v. *Bandemer*, 478 U. S. 109, 116–117; *Vieth,* 541 U. S., at 272–273; and *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 414 (*LULAC*), this Court's prior cases have left "unresolved whether . . . claims [of legal right] may be brought in cases involving allegations of partisan gerrymandering," *Gill,* 585 U. S., at ___. Two "threshold questions" remained: standing, which was addressed in *Gill*, and "whether [such] claims are justiciable." *Ibid.* Pp. 6–14.

(b) Any standard for resolving partisan gerrymandering claims must be grounded in a "limited and precise rationale" and be "clear, manageable, and politically neutral." *Vieth,* 541 U. S., at 306–308 (Kennedy, J., concurring in judgment). The question is one of degree: How to "provid[e] a standard for deciding how much partisan dominance is too much." *LULAC*, 548 U. S., at 420 (opinion of Kennedy, J.). Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence. Such claims invariably sound in a desire for proportional representation, but the Constitution does not require proportional representation, and federal courts are neither equipped nor authorized to apportion political power as a matter of fairness. It is not even clear what fairness looks like in this context. It may mean achieving a greater number of competitive districts by undoing packing and cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates. But it could mean engaging in cracking and packing to ensure each party its "appropriate" share of "safe" seats. Or perhaps it should be measured by adherence to "traditional" districting criteria. Deciding among those different visions of fairness poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments. And it is only after determining how to define fairness that one can even begin to answer the determinative question: "How much is too much?"

The fact that the Court can adjudicate one-person, one-vote claims does not mean that partisan gerrymandering claims are justiciable. This Court's one-person, one-vote cases recognize that each person is entitled to an equal say in the election of representatives. It hardly follows from that principle that a person is entitled to have his political party achieve representation commensurate to its share of statewide support. Vote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight. That requirement does not extend to political parties; it does not mean that each party must be influential in proportion to the number of its supporters. The racial gerrymandering cases are also inapposite: They call for the elimination of a racial classification, but a partisan gerrymandering claim cannot ask for the elimination of partisanship. Pp. 15–21.

(c) None of the proposed "tests" for evaluating partisan gerrymandering claims meets the need for a limited and precise standard that is judicially discernible and manageable. Pp. 22–30.

(1) The *Common Cause* District Court concluded that all but one of the districts in North Carolina's 2016 Plan violated the Equal Protection Clause by intentionally diluting the voting strength of Demo-

crats.  It applied a three-part test, examining intent, effects, and cau-
sation.  The District Court's "predominant intent" prong is borrowed
from the test used in racial gerrymandering cases.  However, unlike
race-based decisionmaking, which is "inherently suspect," *Miller* v.
*Johnson*, 515 U. S. 900, 915, districting for some level of partisan ad-
vantage is not unconstitutional.  Determining that lines were drawn
on the basis of partisanship does not indicate that districting was
constitutionally impermissible.  The *Common Cause* District Court
also required the plaintiffs to show that vote dilution is "likely to per-
sist" to such a degree that the elected representatives will feel free to
ignore the concerns of the supporters of the minority party.  Experi-
ence proves that accurately predicting electoral outcomes is not sim-
ple, and asking judges to predict how a particular districting map
will perform in future elections risks basing constitutional holdings
on unstable ground outside judicial expertise.  The District Court's
third prong—which gave the defendants an opportunity to show that
discriminatory effects were due to a "legitimate redistricting objec-
tive"—just restates the question asked at the "predominant intent"
prong.  Pp. 22–25.

(2) The District Courts also found partisan gerrymandering
claims justiciable under the First Amendment, coalescing around a
basic three-part test: proof of intent to burden individuals based on
their voting history or party affiliation, an actual burden on political
speech or associational rights, and a causal link between the invidi-
ous intent and actual burden.  But their analysis offers no "clear" and
"manageable" way of distinguishing permissible from impermissible
partisan motivation.  Pp. 25–27.

(3) Using a State's own districting criteria as a baseline from
which to measure how extreme a partisan gerrymander is would be
indeterminate and arbitrary.  Doing so would still leave open the
question of how much political motivation and effect is too much.
Pp. 27–29.

(4) The North Carolina District Court further held that the 2016
Plan violated Article I, §2, and the Elections Clause, Art. I, §4, cl. 1.
But the *Vieth* plurality concluded—without objection from any other
Justice—that neither §2 nor §4 "provides a judicially enforceable limit
on the political considerations that the States and Congress may
take into account when districting."  541 U. S., at 305.  Any assertion
that partisan gerrymanders violate the core right of voters to choose
their representatives is an objection more likely grounded in the
Guarantee Clause of Article IV, §4, which "guarantee[s] to every
State in [the] Union a Republican Form of Government."  This Court
has several times concluded that the Guarantee Clause does not pro-

Syllabus

vide the basis for a justiciable claim. See, *e.g., Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118. Pp. 29–30.

(d) The conclusion that partisan gerrymandering claims are not justiciable neither condones excessive partisan gerrymandering nor condemns complaints about districting to echo into a void. Numerous States are actively addressing the issue through state constitutional amendments and legislation placing power to draw electoral districts in the hands of independent commissions, mandating particular districting criteria for their mapmakers, or prohibiting drawing district lines for partisan advantage. The Framers also gave Congress the power to do something about partisan gerrymandering in the Elections Clause. That avenue for reform established by the Framers, and used by Congress in the past, remains open. Pp. 30–34.

318 F. Supp. 3d 777 and 348 F. Supp. 3d 493, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 18–422, 18–726

_____

## ROBERT A. RUCHO, ET AL., APPELLANTS
18–422                         *v.*
## COMMON CAUSE, ET AL.; AND

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA


## LINDA H. LAMONE, ET AL., APPELLANTS
18–726                         *v.*
## O. JOHN BENISEK, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

[June 27, 2019]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Voters and other plaintiffs in North Carolina and Maryland challenged their States' congressional districting maps as unconstitutional partisan gerrymanders. The North Carolina plaintiffs complained that the State's districting plan discriminated against Democrats; the Maryland plaintiffs complained that their State's plan discriminated against Republicans. The plaintiffs alleged that the gerrymandering violated the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Elections Clause, and Article I, §2, of the Constitution. The District Courts in both cases ruled in favor

of the plaintiffs, and the defendants appealed directly to this Court.

These cases require us to consider once again whether claims of excessive partisanship in districting are "justiciable"—that is, properly suited for resolution by the federal courts. This Court has not previously struck down a districting plan as an unconstitutional partisan gerrymander, and has struggled without success over the past several decades to discern judicially manageable standards for deciding such claims. The districting plans at issue here are highly partisan, by any measure. The question is whether the courts below appropriately exercised judicial power when they found them unconstitutional as well.

I

A

The first case involves a challenge to the congressional redistricting plan enacted by the Republican-controlled North Carolina General Assembly in 2016. *Rucho* v. *Common Cause*, No. 18–422. The Republican legislators leading the redistricting effort instructed their mapmaker to use political data to draw a map that would produce a congressional delegation of ten Republicans and three Democrats. 318 F. Supp. 3d 777, 807–808 (MDNC 2018). As one of the two Republicans chairing the redistricting committee stated, "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country." *Id.*, at 809. He further explained that the map was drawn with the aim of electing ten Republicans and three Democrats because he did "not believe it [would be] possible to draw a map with 11 Republicans and 2 Democrats." *Id.*, at 808. One Democratic state senator objected that entrenching the 10–3 advantage for Republicans was not "fair, reasonable, [or] balanced" because, as recently as 2012, "Democratic con-

gressional candidates had received more votes on a statewide basis than Republican candidates." *Ibid.* The General Assembly was not swayed by that objection and approved the 2016 Plan by a party-line vote. *Id.*, at 809.

In November 2016, North Carolina conducted congressional elections using the 2016 Plan, and Republican candidates won 10 of the 13 congressional districts. *Id.*, at 810. In the 2018 elections, Republican candidates won nine congressional districts, while Democratic candidates won three. The Republican candidate narrowly prevailed in the remaining district, but the State Board of Elections called a new election after allegations of fraud.

This litigation began in August 2016, when the North Carolina Democratic Party, Common Cause (a nonprofit organization), and 14 individual North Carolina voters sued the two lawmakers who had led the redistricting effort and other state defendants in Federal District Court. Shortly thereafter, the League of Women Voters of North Carolina and a dozen additional North Carolina voters filed a similar complaint. The two cases were consolidated.

The plaintiffs challenged the 2016 Plan on multiple constitutional grounds. First, they alleged that the Plan violated the Equal Protection Clause of the Fourteenth Amendment by intentionally diluting the electoral strength of Democratic voters. Second, they claimed that the Plan violated their First Amendment rights by retaliating against supporters of Democratic candidates on the basis of their political beliefs. Third, they asserted that the Plan usurped the right of "the People" to elect their preferred candidates for Congress, in violation of the requirement in Article I, §2, of the Constitution that Members of the House of Representatives be chosen "by the People of the several States." Finally, they alleged that the Plan violated the Elections Clause by exceeding the State's delegated authority to prescribe the "Times,

Places and Manner of holding Elections" for Members of Congress.

After a four-day trial, the three-judge District Court unanimously concluded that the 2016 Plan violated the Equal Protection Clause and Article I of the Constitution. The court further held, with Judge Osteen dissenting, that the Plan violated the First Amendment. *Common Cause* v. *Rucho*, 279 F. Supp. 3d 587 (MDNC 2018). The defendants appealed directly to this Court under 28 U. S. C. §1253.

While that appeal was pending, we decided *Gill* v. *Whitford*, 585 U. S. ___ (2018), a partisan gerrymandering case out of Wisconsin. In that case, we held that a plaintiff asserting a partisan gerrymandering claim based on a theory of vote dilution must establish standing by showing he lives in an allegedly "cracked" or "packed" district. *Id.*, at ___ (slip op., at 17). A "cracked" district is one in which a party's supporters are divided among multiple districts, so that they fall short of a majority in each; a "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others. *Id.*, at ___–___ (slip op., at 3–4).

After deciding *Gill*, we remanded the present case for further consideration by the District Court. 585 U. S. ___ (2018). On remand, the District Court again struck down the 2016 Plan. 318 F. Supp. 3d 777. It found standing and concluded that the case was appropriate for judicial resolution. On the merits, the court found that "the General Assembly's predominant intent was to discriminate against voters who supported or were likely to support non-Republican candidates," and to "entrench Republican candidates" through widespread cracking and packing of Democratic voters. *Id.*, at 883–884. The court rejected the defendants' arguments that the distribution of Republican and Democratic voters throughout North Carolina and the

interest in protecting incumbents neutrally explained the 2016 Plan's discriminatory effects. *Id.*, at 896–899. In the end, the District Court held that 12 of the 13 districts constituted partisan gerrymanders that violated the Equal Protection Clause. *Id.*, at 923.

The court also agreed with the plaintiffs that the 2016 Plan discriminated against them because of their political speech and association, in violation of the First Amendment. *Id.*, at 935. Judge Osteen dissented with respect to that ruling. *Id.*, at 954–955. Finally, the District Court concluded that the 2016 Plan violated the Elections Clause and Article I, §2. *Id.*, at 935–941. The District Court enjoined the State from using the 2016 Plan in any election after the November 2018 general election. *Id.*, at 942.

The defendants again appealed to this Court, and we postponed jurisdiction. 586 U. S. \_\_\_ (2019).

B

The second case before us is *Lamone* v. *Benisek*, No. 18–726. In 2011, the Maryland Legislature—dominated by Democrats—undertook to redraw the lines of that State's eight congressional districts. The Governor at the time, Democrat Martin O'Malley, led the process. He appointed a redistricting committee to help redraw the map, and asked Congressman Steny Hoyer, who has described himself as a "serial gerrymanderer," to advise the committee. 348 F. Supp. 3d 493, 502 (Md. 2018). The Governor later testified that his aim was to "use the redistricting process to change the overall composition of Maryland's congressional delegation to 7 Democrats and 1 Republican by flipping" one district. *Ibid*. "[A] decision was made to go for the Sixth," *ibid.*, which had been held by a Republican for nearly two decades. To achieve the required equal population among districts, only about 10,000 residents needed to be removed from that district. *Id.*, at 498. The 2011 Plan accomplished that by moving roughly 360,000

voters out of the Sixth District and moving 350,000 new voters in. Overall, the Plan reduced the number of registered Republicans in the Sixth District by about 66,000 and increased the number of registered Democrats by about 24,000. *Id.*, at 499–501. The map was adopted by a party-line vote. *Id.*, at 506. It was used in the 2012 election and succeeded in flipping the Sixth District. A Democrat has held the seat ever since.

In November 2013, three Maryland voters filed this lawsuit. They alleged that the 2011 Plan violated the First Amendment, the Elections Clause, and Article I, §2, of the Constitution. After considerable procedural skirmishing and litigation over preliminary relief, the District Court entered summary judgment for the plaintiffs. 348 F. Supp. 3d 493. It concluded that the plaintiffs' claims were justiciable, and that the Plan violated the First Amendment by diminishing their "ability to elect their candidate of choice" because of their party affiliation and voting history, and by burdening their associational rights. *Id.*, at 498. On the latter point, the court relied upon findings that Republicans in the Sixth District "were burdened in fundraising, attracting volunteers, campaigning, and generating interest in voting in an atmosphere of general confusion and apathy." *Id.*, at 524.

The District Court permanently enjoined the State from using the 2011 Plan and ordered it to promptly adopt a new plan for the 2020 election. *Id.*, at 525. The defendants appealed directly to this Court under 28 U. S. C. §1253. We postponed jurisdiction. 586 U. S. ___ (2019).

## II

### A

Article III of the Constitution limits federal courts to deciding "Cases" and "Controversies." We have understood that limitation to mean that federal courts can address only questions "historically viewed as capable of

resolution through the judicial process." *Flast* v. *Cohen*, 392 U. S. 83, 95 (1968). In these cases we are asked to decide an important question of constitutional law. "But before we do so, we must find that the question is presented in a 'case' or 'controversy' that is, in James Madison's words, 'of a Judiciary Nature.'" *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 342 (2006) (quoting 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966)).

Chief Justice Marshall famously wrote that it is "the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Sometimes, however, "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth* v. *Jubelirer*, 541 U. S. 267, 277 (2004) (plurality opinion). In such a case the claim is said to present a "political question" and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction. *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). Among the political question cases the Court has identified are those that lack "judicially discoverable and manageable standards for resolving [them]." *Ibid.*

Last Term in *Gill* v. *Whitford*, we reviewed our partisan gerrymandering cases and concluded that those cases "leave unresolved whether such claims may be brought." 585 U. S., at ___ (slip op., at 13). This Court's authority to act, as we said in *Gill*, is "grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right." *Ibid.* The question here is whether there is an "appropriate role for the Federal Judiciary" in remedying the problem of partisan gerrymandering—whether such claims are claims of *legal* right, resolvable according to *legal* principles, or political questions that must find their resolution elsewhere. *Id.*, at ___ (slip op., at 8).

## B

Partisan gerrymandering is nothing new. Nor is frustration with it. The practice was known in the Colonies prior to Independence, and the Framers were familiar with it at the time of the drafting and ratification of the Constitution. See *Vieth*, 541 U. S., at 274 (plurality opinion). During the very first congressional elections, George Washington and his Federalist allies accused Patrick Henry of trying to gerrymander Virginia's districts against their candidates—in particular James Madison, who ultimately prevailed over fellow future President James Monroe. Hunter, The First Gerrymander? 9 Early Am. Studies 792–794, 811 (2011). See 5 Writings of Thomas Jefferson 71 (P. Ford ed. 1895) (Letter to W. Short (Feb. 9, 1789)) ("Henry has so modelled the districts for representatives as to tack Orange [county] to counties where he himself has great influence that Madison may not be elected into the lower federal house").

In 1812, Governor of Massachusetts and future Vice President Elbridge Gerry notoriously approved congressional districts that the legislature had drawn to aid the Democratic-Republican Party. The moniker "gerrymander" was born when an outraged Federalist newspaper observed that one of the misshapen districts resembled a salamander. See *Vieth*, 541 U. S., at 274 (plurality opinion); E. Griffith, The Rise and Development of the Gerrymander 17–19 (1907). "By 1840, the gerrymander was a recognized force in party politics and was generally attempted in all legislation enacted for the formation of election districts. It was generally conceded that each party would attempt to gain power which was not proportionate to its numerical strength." *Id.*, at 123.

The Framers addressed the election of Representatives to Congress in the Elections Clause. Art. I, §4, cl. 1. That provision assigns to state legislatures the power to prescribe the "Times, Places and Manner of holding Elec-

tions" for Members of Congress, while giving Congress the power to "make or alter" any such regulations. Whether to give that supervisory authority to the National Government was debated at the Constitutional Convention. When those opposed to such congressional oversight moved to strike the relevant language, Madison came to its defense:

> "[T]he State Legislatures will sometimes fail or refuse to consult the common interest at the expense of their local coveniency or prejudices. . . . Whenever the State Legislatures had a favorite measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed." 2 Records of the Federal Convention of 1787, at 240–241.

During the subsequent fight for ratification, the provision remained a subject of debate. Antifederalists predicted that Congress's power under the Elections Clause would allow Congress to make itself "omnipotent," setting the "time" of elections as never or the "place" in difficult to reach corners of the State. Federalists responded that, among other justifications, the revisionary power was necessary to counter state legislatures set on undermining fair representation, including through malapportionment. M. Klarman, The Framers' Coup: The Making of the United States Constitution 340–342 (2016). The Federalists were, for example, concerned that newly developing population centers would be deprived of their proper electoral weight, as some cities had been in Great Britain. See 6 The Documentary History of the Ratification of the Constitution: Massachusetts 1278–1279 (J. Kaminski & G. Saladino eds. 2000).

Congress has regularly exercised its Elections Clause power, including to address partisan gerrymandering. The Apportionment Act of 1842, which required single-

member districts for the first time, specified that those districts be "composed of contiguous territory," Act of June 25, 1842, ch. 47, 5 Stat. 491, in "an attempt to forbid the practice of the gerrymander," Griffith, *supra*, at 12. Later statutes added requirements of compactness and equality of population. Act of Jan. 16, 1901, ch. 93, §3, 31 Stat. 733; Act of Feb. 2, 1872, ch. 11, §2, 17 Stat. 28. (Only the single member district requirement remains in place today. 2 U. S. C. §2c.) See *Vieth*, 541 U. S., at 276 (plurality opinion). Congress also used its Elections Clause power in 1870, enacting the first comprehensive federal statute dealing with elections as a way to enforce the Fifteenth Amendment. Force Act of 1870, ch. 114, 16 Stat. 140. Starting in the 1950s, Congress enacted a series of laws to protect the right to vote through measures such as the suspension of literacy tests and the prohibition of English-only elections. See, *e.g.*, 52 U. S. C. §10101 *et seq.*

Appellants suggest that, through the Elections Clause, the Framers set aside electoral issues such as the one before us as questions that only Congress can resolve. See *Baker*, 369 U. S., at 217. We do not agree. In two areas—one-person, one-vote and racial gerrymandering—our cases have held that there is a role for the courts with respect to at least some issues that could arise from a State's drawing of congressional districts. See *Wesberry* v. *Sanders*, 376 U. S. 1 (1964); *Shaw* v. *Reno*, 509 U. S. 630 (1993) (*Shaw I*).

But the history is not irrelevant. The Framers were aware of electoral districting problems and considered what to do about them. They settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress. As Alexander Hamilton explained, "it will . . . not be denied that a discretionary power over elections ought to exist somewhere. It will, I presume, be as readily conceded that there were only three ways in which this power could

have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter, and ultimately in the former." The Federalist No. 59, p. 362 (C. Rossiter ed. 1961). At no point was there a suggestion that the federal courts had a role to play. Nor was there any indication that the Framers had ever heard of courts doing such a thing.

## C

Courts have nevertheless been called upon to resolve a variety of questions surrounding districting. Early on, doubts were raised about the competence of the federal courts to resolve those questions. See *Wood* v. *Broom*, 287 U. S. 1 (1932); *Colegrove* v. *Green*, 328 U. S. 549 (1946).

In the leading case of *Baker* v. *Carr*, voters in Tennessee complained that the State's districting plan for state representatives "debase[d]" their votes, because the plan was predicated on a 60-year-old census that no longer reflected the distribution of population in the State. The plaintiffs argued that votes of people in overpopulated districts held less value than those of people in less-populated districts, and that this inequality violated the Equal Protection Clause of the Fourteenth Amendment. The District Court dismissed the action on the ground that the claim was not justiciable, relying on this Court's precedents, including *Colegrove*. *Baker* v. *Carr*, 179 F. Supp. 824, 825, 826 (MD Tenn. 1959). This Court reversed. It identified various considerations relevant to determining whether a claim is a nonjusticiable political question, including whether there is "a lack of judicially discoverable and manageable standards for resolving it." 369 U. S., at 217. The Court concluded that the claim of population inequality among districts did not fall into that category, because such a claim could be decided under basic equal protection principles. *Id.*, at 226. In *Wesberry* v. *Sanders*,

the Court extended its ruling to malapportionment of congressional districts, holding that Article I, §2, required that "one man's vote in a congressional election is to be worth as much as another's." 376 U. S., at 8.

Another line of challenges to districting plans has focused on race. Laws that explicitly discriminate on the basis of race, as well as those that are race neutral on their face but are unexplainable on grounds other than race, are of course presumptively invalid. The Court applied those principles to electoral boundaries in *Gomillion* v. *Lightfoot*, concluding that a challenge to an "uncouth twenty-eight sided" municipal boundary line that excluded black voters from city elections stated a constitutional claim. 364 U. S. 339, 340 (1960). In *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), the Court extended the reasoning of *Gomillion* to congressional districting. See *Shaw I*, 509 U. S., at 645.

Partisan gerrymandering claims have proved far more difficult to adjudicate. The basic reason is that, while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, "a jurisdiction may engage in constitutional political gerrymandering." *Hunt* v. *Cromartie*, 526 U. S. 541, 551 (1999) (citing *Bush* v. *Vera*, 517 U. S. 952, 968 (1996); *Shaw* v. *Hunt*, 517 U. S. 899, 905 (1996) (*Shaw II*); *Miller* v. *Johnson*, 515 U. S. 900, 916 (1995); *Shaw I*, 509 U. S., at 646). See also *Gaffney* v. *Cummings*, 412 U. S. 735, 753 (1973) (recognizing that "[p]olitics and political considerations are inseparable from districting and apportionment").

To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities. The "central problem" is not determining whether a jurisdiction has engaged in partisan gerrymandering. It is "determining when political gerry-

mandering has gone too far." *Vieth*, 541 U. S., at 296 (plurality opinion). See *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 420 (2006) (*LULAC*) (opinion of Kennedy, J.) (difficulty is "providing a standard for deciding how much partisan dominance is too much").

We first considered a partisan gerrymandering claim in *Gaffney* v. *Cummings* in 1973. There we rejected an equal protection challenge to Connecticut's redistricting plan, which "aimed at a rough scheme of proportional representation of the two major political parties" by "wiggl[ing] and joggl[ing] boundary lines" to create the appropriate number of safe seats for each party. 412 U. S., at 738, 752, n. 18 (internal quotation marks omitted). In upholding the State's plan, we reasoned that districting "inevitably has and is intended to have substantial political consequences." *Id.*, at 753.

Thirteen years later, in *Davis* v. *Bandemer*, we addressed a claim that Indiana Republicans had cracked and packed Democrats in violation of the Equal Protection Clause. 478 U. S. 109, 116–117 (1986) (plurality opinion). A majority of the Court agreed that the case was justiciable, but the Court splintered over the proper standard to apply. Four Justices would have required proof of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.*, at 127. Two Justices would have focused on "whether the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve illegitimate ends." *Id.*, at 165 (Powell, J., concurring in part and dissenting in part). Three Justices, meanwhile, would have held that the Equal Protection Clause simply "does not supply judicially manageable standards for resolving purely political gerrymandering claims." *Id.*, at 147 (O'Connor, J., concurring in judgment). At the end of the day, there was "no 'Court' for a standard that properly should be applied in determining whether a challenged redistricting

plan is an unconstitutional partisan political gerryman-
der." *Id.*, at 185, n. 25 (opinion of Powell, J.). In any
event, the Court held that the plaintiffs had failed to show
that the plan violated the Constitution.

Eighteen years later, in *Vieth*, the plaintiffs complained
that Pennsylvania's legislature "ignored all traditional
redistricting criteria, including the preservation of local
government boundaries," in order to benefit Republican
congressional candidates. 541 U. S., at 272–273 (plurality
opinion) (brackets omitted). Justice Scalia wrote for a
four-Justice plurality. He would have held that the plain-
tiffs' claims were nonjusticiable because there was no
"judicially discernible and manageable standard" for
deciding them. *Id.*, at 306. Justice Kennedy, concurring
in the judgment, noted "the lack of comprehensive and
neutral principles for drawing electoral boundaries [and]
the absence of rules to limit and confine judicial interven-
tion." *Id.*, at 306–307. He nonetheless left open the possi-
bility that "in another case a standard might emerge." *Id.*,
at 312. Four Justices dissented.

In *LULAC*, the plaintiffs challenged a mid-decade redis-
tricting map approved by the Texas Legislature. Once
again a majority of the Court could not find a justiciable
standard for resolving the plaintiffs' partisan gerryman-
dering claims. See 548 U. S., at 414 (noting that the
"disagreement over what substantive standard to apply"
that was evident in *Bandemer* "persists").

As we summed up last Term in *Gill*, our "considerable
efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave
unresolved whether . . . claims [of legal right] may be
brought in cases involving allegations of partisan gerry-
mandering." 585 U. S., at ___ (slip op., at 13). Two
"threshold questions" remained: standing, which we ad-
dressed in *Gill*, and "whether [such] claims are justicia-
ble." *Ibid.*

### III

#### A

In considering whether partisan gerrymandering claims are justiciable, we are mindful of Justice Kennedy's counsel in *Vieth*: Any standard for resolving such claims must be grounded in a "limited and precise rationale" and be "clear, manageable, and politically neutral." 541 U. S., at 306–308 (opinion concurring in judgment). An important reason for those careful constraints is that, as a Justice with extensive experience in state and local politics put it, "[t]he opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States." *Bandemer*, 478 U. S., at 145 (opinion of O'Connor, J.). See *Gaffney*, 412 U. S., at 749 (observing that districting implicates "fundamental 'choices about the nature of representation'" (quoting *Burns* v. *Richardson*, 384 U. S. 73, 92 (1966))). An expansive standard requiring "the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process," *Vieth*, 541 U. S., at 306 (opinion of Kennedy, J.).

As noted, the question is one of degree: How to "provid[e] a standard for deciding how much partisan dominance is too much." *LULAC*, 548 U. S., at 420 (opinion of Kennedy, J.). And it is vital in such circumstances that the Court act only in accord with especially clear standards: "With uncertain limits, intervening courts— even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust." *Vieth*, 541 U. S., at 307 (opinion of Kennedy, J.). If federal courts are to "inject [themselves] into the most heated partisan issues" by adjudicating partisan gerrymandering claims, *Bandemer*, 478 U. S., at 145 (opinion of O'Connor, J.), they must be armed with a standard that can reliably differen-

tiate unconstitutional from "constitutional political gerry-mandering." *Cromartie*, 526 U. S., at 551.

## B

Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence. Explicitly or implicitly, a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate statewide support into seats in the legislature. But such a claim is based on a "norm that does not exist" in our electoral system—"statewide elections for representatives along party lines." *Bandemer*, 478 U. S., at 159 (opinion of O'Connor, J.).

Partisan gerrymandering claims invariably sound in a desire for proportional representation. As Justice O'Connor put it, such claims are based on "a conviction that the greater the departure from proportionality, the more suspect an apportionment plan becomes." *Ibid.* "Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be." *Id.*, at 130 (plurality opinion). See *Mobile* v. *Bolden*, 446 U. S. 55, 75–76 (1980) (plurality opinion) ("The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization.").

The Founders certainly did not think proportional representation was required. For more than 50 years after ratification of the Constitution, many States elected their congressional representatives through at-large or "general ticket" elections. Such States typically sent single-party delegations to Congress. See E. Engstrom, Partisan Gerrymandering and the Construction of American Democracy

43–51 (2013). That meant that a party could garner nearly half of the vote statewide and wind up without any seats in the congressional delegation. The Whigs in Alabama suffered that fate in 1840: "their party garnered 43 percent of the statewide vote, yet did not receive a single seat." *Id.*, at 48. When Congress required single-member districts in the Apportionment Act of 1842, it was not out of a general sense of fairness, but instead a (mis)calculation by the Whigs that such a change would improve their electoral prospects. *Id.*, at 43–44.

Unable to claim that the Constitution requires proportional representation outright, plaintiffs inevitably ask the courts to make their own political judgment about how much representation particular political parties *deserve*— based on the votes of their supporters—and to rearrange the challenged districts to achieve that end. But federal courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so. As Justice Scalia put it for the plurality in *Vieth*:

> "'Fairness' does not seem to us a judicially manageable standard. . . . Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking." 541 U. S., at 291.

The initial difficulty in settling on a "clear, manageable and politically neutral" test for fairness is that it is not even clear what fairness looks like in this context. There is a large measure of "unfairness" in any winner-take-all system. Fairness may mean a greater number of competitive districts. Such a claim seeks to undo packing and

cracking so that supporters of the disadvantaged party have a better shot at electing their preferred candidates. But making as many districts as possible more competitive could be a recipe for disaster for the disadvantaged party. As Justice White has pointed out, "[i]f all or most of the districts are competitive . . . even a narrow statewide preference for either party would produce an overwhelming majority for the winning party in the state legislature." *Bandemer*, 478 U. S., at 130 (plurality opinion).

On the other hand, perhaps the ultimate objective of a "fairer" share of seats in the congressional delegation is most readily achieved by yielding to the gravitational pull of proportionality and engaging in cracking and packing, to ensure each party its "appropriate" share of "safe" seats. See *id.*, at 130–131 ("To draw district lines to maximize the representation of each major party would require creating as many safe seats for each party as the demographic and predicted political characteristics of the State would permit."); *Gaffney*, 412 U. S., at 735–738. Such an approach, however, comes at the expense of competitive districts and of individuals in districts allocated to the opposing party.

Or perhaps fairness should be measured by adherence to "traditional" districting criteria, such as maintaining political subdivisions, keeping communities of interest together, and protecting incumbents. See Brief for Bipartisan Group of Current and Former Members of the House of Representatives as *Amici Curiae*; Brief for Professor Wesley Pegden et al. as *Amici Curiae* in No. 18–422. But protecting incumbents, for example, enshrines a particular partisan distribution. And the "natural political geography" of a State—such as the fact that urban electoral districts are often dominated by one political party—can itself lead to inherently packed districts. As Justice Kennedy has explained, traditional criteria such as compactness and contiguity "cannot promise political neutrality

when used as the basis for relief. Instead, it seems, a decision under these standards would unavoidably have significant political effect, whether intended or not." *Vieth*, 541 U. S., at 308–309 (opinion concurring in judgment). See *id.*, at 298 (plurality opinion) ("[P]acking and cracking, whether intentional or no, are quite consistent with adherence to compactness and respect for political subdivision lines").

Deciding among just these different visions of fairness (you can imagine many others) poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral. Any judicial decision on what is "fair" in this context would be an "unmoored determination" of the sort characteristic of a political question beyond the competence of the federal courts. *Zivotofsky* v. *Clinton*, 566 U. S. 189, 196 (2012).

And it is only after determining how to define fairness that you can even begin to answer the determinative question: "How much is too much?" At what point does permissible partisanship become unconstitutional? If compliance with traditional districting criteria is the fairness touchstone, for example, how much deviation from those criteria is constitutionally acceptable and how should mapdrawers prioritize competing criteria? Should a court "reverse gerrymander" other parts of a State to counteract "natural" gerrymandering caused, for example, by the urban concentration of one party? If a districting plan protected half of the incumbents but redistricted the rest into head to head races, would that be constitutional? A court would have to rank the relative importance of those traditional criteria and weigh how much deviation from each to allow.

If a court instead focused on the respective number of seats in the legislature, it would have to decide the ideal

number of seats for each party and determine at what point deviation from that balance went too far. If a 5–3 allocation corresponds most closely to statewide vote totals, is a 6–2 allocation permissible, given that legislatures have the authority to engage in a certain degree of partisan gerrymandering? Which seats should be packed and which cracked? Or if the goal is as many competitive districts as possible, how close does the split need to be for the district to be considered competitive? Presumably not all districts could qualify, so how to choose? Even assuming the court knew which version of fairness to be looking for, there are no discernible and manageable standards for deciding whether there has been a violation. The questions are "unguided and ill suited to the development of judicial standards," *Vieth*, 541 U. S., at 296 (plurality opinion), and "results from one gerrymandering case to the next would likely be disparate and inconsistent," *id.*, at 308 (opinion of Kennedy, J.).

Appellees contend that if we can adjudicate one-person, one-vote claims, we can also assess partisan gerrymandering claims. But the one-person, one-vote rule is relatively easy to administer as a matter of math. The same cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly. It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support.

More fundamentally, "vote dilution" in the one-person, one-vote cases refers to the idea that each vote must carry equal weight. In other words, each representative must be accountable to (approximately) the same number of constituents. That requirement does not extend to political parties. It does not mean that each party must be influen-

tial in proportion to its number of supporters. As we stated unanimously in *Gill*, "this Court is not responsible for vindicating generalized partisan preferences. The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." 585 U. S., at ___ (slip op., at 21). See also *Bandemer*, 478 U. S., at 150 (opinion of O'Connor, J.) ("[T]he Court has not accepted the argument that an 'asserted entitlement to group representation' . . . can be traced to the one person, one vote principle." (quoting *Bolden*, 446 U. S., at 77)).*

Nor do our racial gerrymandering cases provide an appropriate standard for assessing partisan gerrymandering. "[N]othing in our case law compels the conclusion that racial and political gerrymanders are subject to precisely the same constitutional scrutiny. In fact, our country's long and persistent history of racial discrimination in voting—as well as our Fourteenth Amendment jurisprudence, which always has reserved the strictest scrutiny for discrimination on the basis of race—would seem to compel the opposite conclusion." *Shaw I*, 509 U. S., at 650 (citation omitted). Unlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship.

————————

*The dissent's observation that the Framers viewed political parties "with deep suspicion, as fomenters of factionalism and symptoms of disease in the body politic" *post*, at 9, n. 1 (opinion of KAGAN, J.) (internal quotation marks and alteration omitted), is exactly right. Its inference from that fact is exactly wrong. The Framers would have been amazed at a constitutional theory that guarantees a certain degree of representation to political parties.

## IV

Appellees and the dissent propose a number of "tests" for evaluating partisan gerrymandering claims, but none meets the need for a limited and precise standard that is judicially discernible and manageable. And none provides a solid grounding for judges to take the extraordinary step of reallocating power and influence between political parties.

## A

The *Common Cause* District Court concluded that all but one of the districts in North Carolina's 2016 Plan violated the Equal Protection Clause by intentionally diluting the voting strength of Democrats. 318 F. Supp. 3d, at 923. In reaching that result the court first required the plaintiffs to prove "that a legislative mapdrawer's predominant purpose in drawing the lines of a particular district was to 'subordinate adherents of one political party and entrench a rival party in power.'" *Id.*, at 865 (quoting *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___, ___ (2015) (slip op., at 1)). The District Court next required a showing "that the dilution of the votes of supporters of a disfavored party in a particular district—by virtue of cracking or packing— is likely to persist in subsequent elections such that an elected representative from the favored party in the district will not feel a need to be responsive to constituents who support the disfavored party." 318 F. Supp. 3d, at 867. Finally, after a prima facie showing of partisan vote dilution, the District Court shifted the burden to the defendants to prove that the discriminatory effects are "attributable to a legitimate state interest or other neutral explanation." *Id.*, at 868.

The District Court's "predominant intent" prong is borrowed from the racial gerrymandering context. In racial gerrymandering cases, we rely on a "predominant

intent" inquiry to determine whether race was, in fact, the reason particular district boundaries were drawn the way they were. If district lines were drawn for the purpose of separating racial groups, then they are subject to strict scrutiny because "race-based decisionmaking is inherently suspect." *Miller*, 515 U. S., at 915. See *Bush*, 517 U. S., at 959 (principal opinion). But determining that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent— securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent "predominates."

The District Court tried to limit the reach of its test by requiring plaintiffs to show, in addition to predominant partisan intent, that vote dilution "is likely to persist" to such a degree that the elected representative will feel free to ignore the concerns of the supporters of the minority party. 318 F. Supp. 3d, at 867. But "[t]o allow district courts to strike down apportionment plans on the basis of their prognostications as to the outcome of future elections . . . invites 'findings' on matters as to which neither judges nor anyone else can have any confidence." *Bandemer*, 478 U. S., at 160 (opinion of O'Connor, J.). See *LULAC*, 548 U. S., at 420 (opinion of Kennedy, J.) ("[W]e are wary of adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs."). And the test adopted by the *Common Cause* court requires a far more nuanced prediction than simply who would prevail in future political contests. Judges must forecast with unspecified certainty whether a prospective winner will have a margin of victory sufficient to permit him to ignore the supporters of his defeated opponent (whoever that may turn out to be). Judges not only have to pick the winner—they have to beat the point spread.

The appellees assure us that "the persistence of a

party's advantage may be shown through sensitivity testing: probing how a plan would perform under other plausible electoral conditions." Brief for Appellees League of Women Voters of North Carolina et al. in No. 18–422, p. 55. See also 318 F. Supp. 3d, at 885. Experience proves that accurately predicting electoral outcomes is not so simple, either because the plans are based on flawed assumptions about voter preferences and behavior or because demographics and priorities change over time. In our two leading partisan gerrymandering cases themselves, the predictions of durability proved to be dramatically wrong. In 1981, Republicans controlled both houses of the Indiana Legislature as well as the governorship. Democrats challenged the state legislature districting map enacted by the Republicans. This Court in *Bandemer* rejected that challenge, and just months later the Democrats increased their share of House seats in the 1986 elections. Two years later the House was split 50–50 between Democrats and Republicans, and the Democrats took control of the chamber in 1990. Democrats also challenged the Pennsylvania congressional districting plan at issue in *Vieth*. Two years after that challenge failed, they gained four seats in the delegation, going from a 12–7 minority to an 11–8 majority. At the next election, they flipped another Republican seat.

Even the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change. Voters elect individual candidates in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations. Many voters split their tickets. Others never register with a political party, and vote for candidates from both major parties at different

points during their lifetimes. For all of those reasons, asking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.

It is hard to see what the District Court's third prong—providing the defendant an opportunity to show that the discriminatory effects were due to a "legitimate redistricting objective"—adds to the inquiry. 318 F. Supp. 3d, at 861. The first prong already requires the plaintiff to prove that partisan advantage predominates. Asking whether a legitimate purpose other than partisanship was the motivation for a particular districting map just restates the question.

B

The District Courts also found partisan gerrymandering claims justiciable under the First Amendment, coalescing around a basic three-part test: proof of intent to burden individuals based on their voting history or party affiliation; an actual burden on political speech or associational rights; and a causal link between the invidious intent and actual burden. See *Common Cause*, 318 F. Supp. 3d, at 929; *Benisek*, 348 F. Supp. 3d, at 522. Both District Courts concluded that the districting plans at issue violated the plaintiffs' First Amendment right to association. The District Court in North Carolina relied on testimony that, after the 2016 Plan was put in place, the plaintiffs faced "difficulty raising money, attracting candidates, and mobilizing voters to support the political causes and issues such Plaintiffs sought to advance." 318 F. Supp. 3d, at 932. Similarly, the District Court in Maryland examined testimony that "revealed a lack of enthusiasm, indifference to voting, a sense of disenfranchisement, a sense of disconnection, and confusion," and concluded that Republicans in the Sixth District "were burdened in fundraising, attracting volunteers, campaigning, and generating inter-

est in voting." 348 F. Supp. 3d, at 523–524.

To begin, there are no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue. The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district.

The plaintiffs' argument is that partisanship in districting should be regarded as simple discrimination against supporters of the opposing party on the basis of political viewpoint. Under that theory, any level of partisanship in districting would constitute an infringement of their First Amendment rights. But as the Court has explained, "[i]t would be idle . . . to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it." *Gaffney*, 412 U. S., at 752. The First Amendment test simply describes the act of districting for partisan advantage. It provides no standard for determining when partisan activity goes too far.

As for actual burden, the slight anecdotal evidence found sufficient by the District Courts in these cases shows that this too is not a serious standard for separating constitutional from unconstitutional partisan gerrymandering. The District Courts relied on testimony about difficulty drumming up volunteers and enthusiasm. How much of a decline in voter engagement is enough to constitute a First Amendment burden? How many door knocks must go unanswered? How many petitions unsigned? How many calls for volunteers unheeded? The *Common Cause* District Court held that a partisan gerrymander places an unconstitutional burden on speech if it has more than a "*de minimis*" "chilling effect or adverse impact" on any First Amendment activity. 318 F. Supp. 3d, at 930. The court went on to rule that there would be an adverse effect "even if the speech of [the plaintiffs] was not *in fact* chilled"; it was enough that the districting plan "makes it

easier for supporters of Republican candidates to translate their votes into seats," thereby "enhanc[ing] the[ir] relative voice." *Id.*, at 933 (internal quotation marks omitted).

These cases involve blatant examples of partisanship driving districting decisions. But the First Amendment analysis below offers no "clear" and "manageable" way of distinguishing permissible from impermissible partisan motivation. The *Common Cause* court embraced that conclusion, observing that "a judicially manageable framework for evaluating partisan gerrymandering claims need not distinguish an 'acceptable' level of partisan gerrymandering from 'excessive' partisan gerrymandering" because "the Constitution does not authorize state redistricting bodies to engage in such partisan gerrymandering." *Id.*, at 851. The decisions below prove the prediction of the *Vieth* plurality that "a First Amendment claim, if it were sustained, would render unlawful *all* consideration of political affiliation in districting," 541 U. S., at 294, contrary to our established precedent.

## C

The dissent proposes using a State's own districting criteria as a neutral baseline from which to measure how extreme a partisan gerrymander is. The dissent would have us line up all the possible maps drawn using those criteria according to the partisan distribution they would produce. Distance from the "median" map would indicate whether a particular districting plan harms supporters of one party to an unconstitutional extent. *Post,* at 18–19, 25 (opinion of KAGAN, J.).

As an initial matter, it does not make sense to use criteria that will vary from State to State and year to year as the baseline for determining whether a gerrymander violates the Federal Constitution. The degree of partisan advantage that the Constitution tolerates should not turn on criteria offered by the gerrymanderers themselves. It

is easy to imagine how different criteria could move the median map toward different partisan distributions. As a result, the same map could be constitutional or not depending solely on what the mapmakers said they set out to do. That possibility illustrates that the dissent's proposed constitutional test is indeterminate and arbitrary.

Even if we were to accept the dissent's proposed baseline, it would return us to "the original unanswerable question (How much political motivation and effect is too much?)." *Vieth*, 541 U. S., at 296–297 (plurality opinion). Would twenty percent away from the median map be okay? Forty percent? Sixty percent? Why or why not? (We appreciate that the dissent finds all the unanswerable questions annoying, see *post*, at 22, but it seems a useful way to make the point.) The dissent's answer says it all: "This much is too much." *Post*, at 25–26. That is not even trying to articulate a standard or rule.

The dissent argues that there are other instances in law where matters of degree are left to the courts. See *post*, at 27. True enough. But those instances typically involve constitutional or statutory provisions or common law confining and guiding the exercise of judicial discretion. For example, the dissent cites the need to determine "substantial anticompetitive effect[s]" in antitrust law. *Post*, at 27 (citing *Ohio* v. *American Express Co.*, 585 U. S. ___ (2018)). That language, however, grew out of the Sherman Act, understood from the beginning to have its "origin in the common law" and to be "familiar in the law of this country prior to and at the time of the adoption of the [A]ct." *Standard Oil Co. of N. J.* v. *United States*, 221 U. S. 1, 51 (1911). Judges began with a significant body of law about what constituted a legal violation. In other cases, the pertinent statutory terms draw meaning from related provisions or statutory context. Here, on the other hand, the Constitution provides no basis whatever to guide the exercise of judicial discretion. Common experi-

ence gives content to terms such as "substantial risk" or "substantial harm," but the same cannot be said of substantial deviation from a median map. There is no way to tell whether the prohibited deviation from that map should kick in at 25 percent or 75 percent or some other point. The only provision in the Constitution that specifically addresses the matter assigns it to the political branches. See Art. I, §4, cl. 1.

D

The North Carolina District Court further concluded that the 2016 Plan violated the Elections Clause and Article I, §2. We are unconvinced by that novel approach.

Article I, §2, provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Art. I, §4, cl. 1.

The District Court concluded that the 2016 Plan exceeded the North Carolina General Assembly's Elections Clause authority because, among other reasons, "the Elections Clause did not empower State legislatures to disfavor the interests of supporters of a particular candidate or party in drawing congressional districts." 318 F. Supp. 3d, at 937. The court further held that partisan gerrymandering infringes the right of "the People" to select their representatives. *Id.*, at 938–940. Before the District Court's decision, no court had reached a similar conclusion. In fact, the plurality in *Vieth* concluded—without objection from any other Justice—that neither §2 nor §4 of Article I "provides a judicially enforceable limit on the political considerations that the States and Congress may take into

account when districting." 541 U. S., at 305.

The District Court nevertheless asserted that partisan gerrymanders violate "the core principle of [our] republican government" preserved in Art. I, §2, "namely, that the voters should choose their representatives, not the other way around." 318 F. Supp. 3d, at 940 (quoting *Arizona State Legislature*, 576 U. S., at ___ (slip op., at 35); internal quotation marks omitted; alteration in original). That seems like an objection more properly grounded in the Guarantee Clause of Article IV, §4, which "guarantee[s] to every State in [the] Union a Republican Form of Government." This Court has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim. See, *e.g.*, *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118 (1912).

## V

Excessive partisanship in districting leads to results that reasonably seem unjust. But the fact that such gerrymandering is "incompatible with democratic principles," *Arizona State Legislature*, 576 U. S., at ___ (slip op., at 1), does not mean that the solution lies with the federal judiciary. We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions. "[J]udicial action must be governed by *standard*, by *rule*," and must be "principled, rational, and based upon reasoned distinctions" found in the Constitution or laws. *Vieth*, 541 U. S., at 278, 279 (plurality opinion). Judicial review of partisan gerrymandering does not meet those basic requirements.

Today the dissent essentially embraces the argument that the Court unanimously rejected in *Gill*: "this Court

*can* address the problem of partisan gerrymandering because it *must*." 585 U. S., at ___ (slip op., at 12). That is not the test of our authority under the Constitution; that document instead "confines the federal courts to a properly judicial role." *Town of Chester* v. *Laroe Estates, Inc.*, 581 U. S. ___, ___ (2017) (slip op., at 4).

What the appellees and dissent seek is an unprecedented expansion of judicial power. We have never struck down a partisan gerrymander as unconstitutional—despite various requests over the past 45 years. The expansion of judicial authority would not be into just any area of controversy, but into one of the most intensely partisan aspects of American political life. That intervention would be unlimited in scope and duration—it would recur over and over again around the country with each new round of districting, for state as well as federal representatives. Consideration of the impact of today's ruling on democratic principles cannot ignore the effect of the unelected and politically unaccountable branch of the Federal Government assuming such an extraordinary and unprecedented role. See *post*, at 32–33.

Our conclusion does not condone excessive partisan gerrymandering. Nor does our conclusion condemn complaints about districting to echo into a void. The States, for example, are actively addressing the issue on a number of fronts. In 2015, the Supreme Court of Florida struck down that State's congressional districting plan as a violation of the Fair Districts Amendment to the Florida Constitution. *League of Women Voters of Florida* v. *Detzner*, 172 So. 3d 363 (2015). The dissent wonders why we can't do the same. See *post*, at 31. The answer is that there is no "Fair Districts Amendment" to the Federal Constitution. Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply. (We do not understand how the dissent can maintain that a provision saying that no districting plan "shall

be drawn with the intent to favor or disfavor a political party" provides little guidance on the question. See *post*, at 31, n. 6.) Indeed, numerous other States are restricting partisan considerations in districting through legislation. One way they are doing so is by placing power to draw electoral districts in the hands of independent commissions. For example, in November 2018, voters in Colorado and Michigan approved constitutional amendments creating multimember commissions that will be responsible in whole or in part for creating and approving district maps for congressional and state legislative districts. See Colo. Const., Art. V, §§44, 46; Mich. Const., Art. IV, §6. Missouri is trying a different tack. Voters there overwhelmingly approved the creation of a new position—state demographer—to draw state legislative district lines. Mo. Const., Art. III, §3.

Other States have mandated at least some of the traditional districting criteria for their mapmakers. Some have outright prohibited partisan favoritism in redistricting. See Fla. Const., Art. III, §20(a) ("No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent."); Mo. Const., Art. III, §3 ("Districts shall be designed in a manner that achieves both partisan fairness and, secondarily, competitiveness. 'Partisan fairness' means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency."); Iowa Code §42.4(5) (2016) ("No district shall be drawn for the purpose of favoring a political party, incumbent legislator or member of Congress, or other person or group."); Del. Code Ann., Tit. xxix, §804 (2017) (providing that in determining district boundaries for the state legislature, no district shall "be created so as to unduly favor any person or political party").

As noted, the Framers gave Congress the power to do something about partisan gerrymandering in the Elections

Clause. The first bill introduced in the 116th Congress would require States to create 15-member independent commissions to draw congressional districts and would establish certain redistricting criteria, including protection for communities of interest, and ban partisan gerrymandering. H. R. 1, 116th Cong., 1st Sess., §§2401, 2411 (2019).

Dozens of other bills have been introduced to limit reliance on political considerations in redistricting. In 2010, H. R. 6250 would have required States to follow standards of compactness, contiguity, and respect for political subdivisions in redistricting. It also would have prohibited the establishment of congressional districts "with the major purpose of diluting the voting strength of any person, or group, including any political party," except when necessary to comply with the Voting Rights Act of 1965. H. R. 6250, 111th Cong., 2d Sess., §2 (referred to committee).

Another example is the Fairness and Independence in Redistricting Act, which was introduced in 2005 and has been reintroduced in every Congress since. That bill would require every State to establish an independent commission to adopt redistricting plans. The bill also set forth criteria for the independent commissions to use, such as compactness, contiguity, and population equality. It would prohibit consideration of voting history, political party affiliation, or incumbent Representative's residence. H. R. 2642, 109th Cong., 1st Sess., §4 (referred to subcommittee).

We express no view on any of these pending proposals. We simply note that the avenue for reform established by the Framers, and used by Congress in the past, remains open.

\*          \*          \*

No one can accuse this Court of having a crabbed view of

the reach of its competence. But we have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide us in the exercise of such authority. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch, at 177. In this rare circumstance, that means our duty is to say "this is not law."

The judgments of the United States District Court for the Middle District of North Carolina and the United States District Court for the District of Maryland are vacated, and the cases are remanded with instructions to dismiss for lack of jurisdiction.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 18–422, 18–726

_____

ROBERT A. RUCHO, ET AL., APPELLANTS
18–422                *v.*
COMMON CAUSE, ET AL.; AND

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

LINDA H. LAMONE, ET AL., APPELLANTS
18–726                *v.*
O. JOHN BENISEK, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

[June 27, 2019]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

For the first time ever, this Court refuses to remedy a constitutional violation because it thinks the task beyond judicial capabilities.

And not just any constitutional violation. The partisan gerrymanders in these cases deprived citizens of the most fundamental of their constitutional rights: the rights to participate equally in the political process, to join with others to advance political beliefs, and to choose their political representatives. In so doing, the partisan gerrymanders here debased and dishonored our democracy, turning upside-down the core American idea that all governmental power derives from the people. These gerrymanders enabled politicians to entrench themselves in office as against voters' preferences. They promoted parti-

sanship above respect for the popular will.  They encouraged a politics of polarization and dysfunction.  If left unchecked, gerrymanders like the ones here may irreparably damage our system of government.

And checking them is *not* beyond the courts.  The majority's abdication comes just when courts across the country, including those below, have coalesced around manageable judicial standards to resolve partisan gerrymandering claims.  Those standards satisfy the majority's own benchmarks.  They do not require—indeed, they do not permit—courts to rely on their own ideas of electoral fairness, whether proportional representation or any other.  And they limit courts to correcting only egregious gerrymanders, so judges do not become omnipresent players in the political process.  But yes, the standards used here do allow—as well they should—judicial intervention in the worst-of-the-worst cases of democratic subversion, causing blatant constitutional harms.  In other words, they allow courts to undo partisan gerrymanders of the kind we face today from North Carolina and Maryland.  In giving such gerrymanders a pass from judicial review, the majority goes tragically wrong.

I

Maybe the majority errs in these cases because it pays so little attention to the constitutional harms at their core.  After dutifully reciting each case's facts, the majority leaves them forever behind, instead immersing itself in everything that could conceivably go amiss if courts became involved.  So it is necessary to fill in the gaps.  To recount exactly what politicians in North Carolina and Maryland did to entrench their parties in political office, whatever the electorate might think.  And to elaborate on the constitutional injury those politicians wreaked, to our democratic system and to individuals' rights.  All that will help in considering whether courts confronting partisan

gerrymandering claims are really so hamstrung—so unable to carry out their constitutional duties—as the majority thinks.

## A

The plaintiffs here challenge two congressional districting plans—one adopted by Republicans in North Carolina and the other by Democrats in Maryland—as unconstitutional partisan gerrymanders. As I relate what happened in those two States, ask yourself: Is this how American democracy is supposed to work?

Start with North Carolina. After the 2010 census, the North Carolina General Assembly, with Republican majorities in both its House and its Senate, enacted a new congressional districting plan. That plan governed the two next national elections. In 2012, Republican candidates won 9 of the State's 13 seats in the U. S. House of Representatives, although they received only 49% of the statewide vote. In 2014, Republican candidates increased their total to 10 of the 13 seats, this time based on 55% of the vote. Soon afterward, a District Court struck down two districts in the plan as unconstitutional racial gerrymanders. See *Harris* v. *McCrory*, 159 F. Supp. 3d 600 (MDNC 2016), aff'd *sub nom. Cooper* v. *Harris*, 581 U. S. \_\_\_ (2017). The General Assembly, with both chambers still controlled by Republicans, went back to the drawing board to craft the needed remedial state map. And here is how the process unfolded:

- The Republican co-chairs of the Assembly's redistricting committee, Rep. David Lewis and Sen. Robert Rucho, instructed Dr. Thomas Hofeller, a Republican districting specialist, to create a new map that would maintain the 10–3 composition of the State's congressional delegation come what might. Using sophisticated technological tools and

precinct-level election results selected to predict voting behavior, Hofeller drew district lines to minimize Democrats' voting strength and ensure the election of 10 Republican Congressmen. See *Common Cause* v. *Rucho*, 318 F. Supp. 3d 777, 805–806 (MDNC 2018).

- Lewis then presented for the redistricting committee's (retroactive) approval a list of the criteria Hofeller had employed—including one labeled "Partisan Advantage." That criterion, endorsed by a party-line vote, stated that the committee would make all "reasonable efforts to construct districts" to "maintain the current [10–3] partisan makeup" of the State's congressional delegation. *Id.,* at 807.

- Lewis explained the Partisan Advantage criterion to legislators as follows: We are "draw[ing] the maps to give a partisan advantage to 10 Republicans and 3 Democrats because [I] d[o] not believe it['s] possible to draw a map with 11 Republicans and 2 Democrats." *Id.,* at 808 (internal quotation marks omitted).

- The committee and the General Assembly later enacted, again on a party-line vote, the map Hofeller had drawn. See *id.,* at 809.

- Lewis announced: "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country." *Ibid.* (internal quotation marks omitted).

You might think that judgment best left to the American people. But give Lewis credit for this much: The map has worked just as he planned and predicted. In 2016, Repub-

lican congressional candidates won 10 of North Carolina's 13 seats, with 53% of the statewide vote. Two years later, Republican candidates won 9 of 12 seats though they received only 50% of the vote. (The 13th seat has not yet been filled because fraud tainted the initial election.)

Events in Maryland make for a similarly grisly tale. For 50 years, Maryland's 8-person congressional delegation typically consisted of 2 or 3 Republicans and 5 or 6 Democrats. After the 2000 districting, for example, the First and Sixth Districts reliably elected Republicans, and the other districts as reliably elected Democrats. See R. Cohen & J. Barnes, Almanac of American Politics 2016, p. 836 (2015). But in the 2010 districting cycle, the State's Democratic leaders, who controlled the governorship and both houses of the General Assembly, decided to press their advantage.

- Governor Martin O'Malley, who oversaw the process, decided (in his own later words) "to create a map that was more favorable for Democrats over the next ten years." Because flipping the First District was geographically next-to-impossible, "a decision was made to go for the Sixth." *Benisek* v. *Lamone*, 348 F. Supp. 3d 493, 502 (Md. 2018) (quoting O'Malley; emphasis deleted).

- O'Malley appointed an advisory committee as the public face of his effort, while asking Congressman Steny Hoyer, a self-described "serial gerrymanderer," to hire and direct a mapmaker. *Id.,* at 502. Hoyer retained Eric Hawkins, an analyst at a political consulting firm providing services to Democrats. See *id.,* at 502–503.

- Hawkins received only two instructions: to ensure that the new map produced 7 reliable Democratic

seats, and to protect all Democratic incumbents. See *id.,* at 503.

- Using similar technologies and election data as Hofeller, Hawkins produced a map to those specifications. Although new census figures required removing only 10,000 residents from the Sixth District, Hawkins proposed a large-scale population transfer. The map moved about 360,000 voters out of the district and another 350,000 in. That swap decreased the number of registered Republicans in the district by over 66,000 and increased the number of registered Democrats by about 24,000, all to produce a safe Democratic district. See *id.,* at 499, 501.

- After the advisory committee adopted the map on a party-line vote, State Senate President Thomas Miller briefed the General Assembly's Democratic caucuses about the new map's aims. Miller told his colleagues that the map would give "Democrats a real opportunity to pick up a seventh seat in the delegation" and that "[i]n the face of Republican gains in redistricting in other states[,] we have a serious obligation to create this opportunity." *Id.,* at 506 (internal quotation marks omitted).

- The General Assembly adopted the plan on a party-line vote. See *id.,* at 506.

Maryland's Democrats proved no less successful than North Carolina's Republicans in devising a voter-proof map. In the four elections that followed (from 2012 through 2018), Democrats have never received more than 65% of the statewide congressional vote. Yet in each of those elections, Democrats have won (you guessed it) 7 of 8

House seats—including the once-reliably-Republican Sixth District.

### B

Now back to the question I asked before: Is that how American democracy is supposed to work? I have yet to meet the person who thinks so.

"Governments," the Declaration of Independence states, "deriv[e] their just Powers from the Consent of the Governed." The Constitution begins: "We the People of the United States." The Gettysburg Address (almost) ends: "[G]overnment of the people, by the people, for the people." If there is a single idea that made our Nation (and that our Nation commended to the world), it is this one: The people are sovereign. The "power," James Madison wrote, "is in the people over the Government, and not in the Government over the people." 4 Annals of Cong. 934 (1794).

Free and fair and periodic elections are the key to that vision. The people get to choose their representatives. And then they get to decide, at regular intervals, whether to keep them. Madison again: "[R]epublican liberty" demands "not only, that all power should be derived from the people; but that those entrusted with it should be kept in dependence on the people." 2 The Federalist No. 37, p. 4 (J. & A. McLean eds. 1788). Members of the House of Representatives, in particular, are supposed to "recollect[ ] [that] dependence" every day. *Id.,* No. 57, at 155. To retain an "intimate sympathy with the people," they must be "compelled to anticipate the moment" when their "exercise of [power] is to be reviewed." *Id.,* Nos. 52, 57, at 124, 155. Election day—next year, and two years later, and two years after that—is what links the people to their representatives, and gives the people their sovereign power. That day is the foundation of democratic governance.

And partisan gerrymandering can make it meaningless. At its most extreme—as in North Carolina and Maryland—the practice amounts to "rigging elections." *Vieth* v. *Jubelirer*, 541 U. S. 267, 317 (2004) (Kennedy, J., concurring in judgment) (internal quotation marks omitted).  By drawing districts to maximize the power of some voters and minimize the power of others, a party in office at the right time can entrench itself there for a decade or more, no matter what the voters would prefer.  Just ask the people of North Carolina and Maryland.  The "core principle of republican government," this Court has recognized, is "that the voters should choose their representatives, not the other way around." *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___, ___ (2015) (slip op., at 35) (internal quotation marks omitted). Partisan gerrymandering turns it the other way around. By that mechanism, politicians can cherry-pick voters to ensure their reelection.  And the power becomes, as Madison put it, "in the Government over the people."  4 Annals of Cong. 934.

The majority disputes none of this.  I think it important to underscore that fact: The majority disputes none of what I have said (or will say) about how gerrymanders undermine democracy.  Indeed, the majority concedes (really, how could it not?) that gerrymandering is "incompatible with democratic principles." *Ante,* at 30 (quoting *Arizona State Legislature*, 576 U. S., at ___ (slip op., at 1)). And therefore what?  That recognition would seem to demand a response.  The majority offers two ideas that might qualify as such.  One is that the political process can deal with the problem—a proposition so dubious on its face that I feel secure in delaying my answer for some time.  See *ante,* at 31–33*; infra,* at 29–31.  The other is that political gerrymanders have always been with us. See *ante,* at 8, 24.  To its credit, the majority does not frame that point as an originalist constitutional argument.

After all (as the majority rightly notes), racial and residential gerrymanders were also once with us, but the Court has done something about that fact. See *ante,* at 10.[1] The majority's idea instead seems to be that if we have lived with partisan gerrymanders so long, we will survive.

That complacency has no cause. Yes, partisan gerrymandering goes back to the Republic's earliest days. (As does vociferous opposition to it.) But big data and modern technology—of just the kind that the mapmakers in North Carolina and Maryland used—make today's gerrymandering altogether different from the crude linedrawing of the past. Old-time efforts, based on little more than guesses, sometimes led to so-called dummymanders— gerrymanders that went spectacularly wrong. Not likely in today's world. Mapmakers now have access to more granular data about party preference and voting behavior than ever before. County-level voting data has given way to precinct-level or city-block-level data; and increasingly, mapmakers avail themselves of data sets providing wide-ranging information about even individual voters. See Brief for Political Science Professors as *Amici Curiae* 20– 22. Just as important, advancements in computing technology have enabled mapmakers to put that information to use with unprecedented efficiency and precision. See *id.,* at 22–25. While bygone mapmakers may have drafted three or four alternative districting plans, today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting tradi-

————————

[1] And even putting that aside, any originalist argument would have to deal with an inconvenient fact. The Framers originally viewed political parties themselves (let alone their most partisan actions) with deep suspicion, as fomenters of factionalism and "symptom[s] of disease in the body politic." G. Wood, Empire of Liberty: A History of the Early Republic, 1789–1815, p. 140 (2009).

tional districting requirements). The effect is to make gerrymanders far more effective and durable than before, insulating politicians against all but the most titanic shifts in the political tides. These are not your grandfather's—let alone the Framers'—gerrymanders.

The proof is in the 2010 pudding. That redistricting cycle produced some of the most extreme partisan gerrymanders in this country's history. I've already recounted the results from North Carolina and Maryland, and you'll hear even more about those. See *supra,* at 4–6; *infra,* at 19–20. But the voters in those States were not the only ones to fall prey to such districting perversions. Take Pennsylvania. In the three congressional elections occurring under the State's original districting plan (before the State Supreme Court struck it down), Democrats received between 45% and 51% of the statewide vote, but won only 5 of 18 House seats. See *League of Women Voters* v. *Pennsylvania*, ___ Pa. ___, ___, 178 A. 3d 737, 764 (2018). Or go next door to Ohio. There, in four congressional elections, Democrats tallied between 39% and 47% of the statewide vote, but never won more than 4 of 16 House seats. See *Ohio A. Philip Randolph Inst.* v. *Householder*, 373 F. Supp. 3d 978, 1074 (SD Ohio 2019). (Nor is there any reason to think that the results in those States stemmed from political geography or non-partisan districting criteria, rather than from partisan manipulation. See *infra*, at 15, 31.) And gerrymanders will only get worse (or depending on your perspective, better) as time goes on—as data becomes ever more fine-grained and data analysis techniques continue to improve. What was possible with paper and pen—or even with Windows 95—doesn't hold a candle (or an LED bulb?) to what will become possible with developments like machine learning. And someplace along this road, "we the people" become sovereign no longer.

## C

Partisan gerrymandering of the kind before us not only subverts democracy (as if that weren't bad enough). It violates individuals' constitutional rights as well. That statement is not the lonesome cry of a dissenting Justice. This Court has recognized extreme partisan gerrymandering as such a violation for many years.

Partisan gerrymandering operates through vote dilution—the devaluation of one citizen's vote as compared to others. A mapmaker draws district lines to "pack" and "crack" voters likely to support the disfavored party. See generally *Gill* v. *Whitford*, 585 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 14–16). He packs supermajorities of those voters into a relatively few districts, in numbers far greater than needed for their preferred candidates to prevail. Then he cracks the rest across many more districts, spreading them so thin that their candidates will not be able to win. Whether the person is packed or cracked, his vote carries less weight—has less consequence—than it would under a neutrally drawn (non-partisan) map. See *id.,* at \_\_\_ (KAGAN, J., concurring) (slip op., at 4). In short, the mapmaker has made some votes count for less, because they are likely to go for the other party.

That practice implicates the Fourteenth Amendment's Equal Protection Clause. The Fourteenth Amendment, we long ago recognized, "guarantees the opportunity for equal participation by all voters in the election" of legislators. *Reynolds* v. *Sims*, 377 U. S. 533, 566 (1964). And that opportunity "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.,* at 555. Based on that principle, this Court in its one-person-one-vote decisions prohibited creating districts with significantly different populations. A State could not, we explained, thus "dilut[e] the weight of votes because of place of residence." *Id.,* at 566. The constitutional injury in a

partisan gerrymandering case is much the same, except
that the dilution is based on party affiliation. In such a
case, too, the districters have set out to reduce the weight
of certain citizens' votes, and thereby deprive them of their
capacity to "full[y] and effective[ly] participat[e] in the
political process[]." *Id.,* at 565. As Justice Kennedy (in a
controlling opinion) once hypothesized: If districters de-
clared that they were drawing a map "so as most to bur-
den [the votes of] Party X's" supporters, it would violate
the Equal Protection Clause. *Vieth*, 541 U. S., at 312. For
(in the language of the one-person-one-vote decisions) it
would infringe those voters' rights to "equal [electoral]
participation." *Reynolds*, 377 U. S., at 566; see *Gray* v.
*Sanders*, 372 U. S. 368, 379–380 (1963) ("The concept of
'we the people' under the Constitution visualizes no pre-
ferred class of voters but equality among those who meet
the basic qualifications").

  And partisan gerrymandering implicates the First
Amendment too. That Amendment gives its greatest
protection to political beliefs, speech, and association. Yet
partisan gerrymanders subject certain voters to "disfa-
vored treatment"—again, counting their votes for less—
precisely because of "their voting history [and] their ex-
pression of political views." *Vieth*, 541 U. S., at 314 (opin-
ion of Kennedy, J.). And added to that strictly personal
harm is an associational one. Representative democracy is
"unimaginable without the ability of citizens to band
together in [support of] candidates who espouse their
political views." *California Democratic Party* v. *Jones*, 530
U. S. 567, 574 (2000). By diluting the votes of certain
citizens, the State frustrates their efforts to translate
those affiliations into political effectiveness. See *Gill*, 585
U. S., at ___ (KAGAN, J., concurring) (slip op., at 9) ("Mem-
bers of the disfavored party[,] deprived of their natural
political strength[,] may face difficulties fundraising,
registering voters, [and] eventually accomplishing their

policy objectives"). In both those ways, partisan gerrymanders of the kind we confront here undermine the protections of "democracy embodied in the First Amendment." *Elrod* v. *Burns*, 427 U. S. 347, 357 (1976) (internal quotation marks omitted).

Though different Justices have described the constitutional harm in diverse ways, nearly all have agreed on this much: Extreme partisan gerrymandering (as happened in North Carolina and Maryland) violates the Constitution. See, *e.g., Vieth*, 541 U. S., at 293 (plurality opinion) ("[A]n excessive injection of politics [in districting] is unlawful" (emphasis deleted)); *id.*, at 316 (opinion of Kennedy, J.) ("[P]artisan gerrymandering that disfavors one party is [im]permissible"); *id.,* at 362 (BREYER, J., dissenting) (Gerrymandering causing political "entrenchment" is a "violat[ion of] the Constitution's Equal Protection Clause"); *Davis* v. *Bandemer*, 478 U. S. 109, 132 (1986) (plurality opinion) ("[U]nconstitutional discrimination" occurs "when the electoral system is arranged in a manner that will consistently degrade [a voter's] influence on the political process"); *id.*, at 165 (Powell, J., concurring) ("Unconstitutional gerrymandering" occurs when "the boundaries of the voting districts have been distorted deliberately" to deprive voters of "an equal opportunity to participate in the State's legislative processes"). Once again, the majority never disagrees; it appears to accept the "principle that each person must have an equal say in the election of representatives." *Ante,* at 20. And indeed, without this settled and shared understanding that cases like these inflict constitutional injury, the question of whether there are judicially manageable standards for resolving them would never come up.

## II

So the only way to understand the majority's opinion is as follows: In the face of grievous harm to democratic

governance and flagrant infringements on individuals' rights—in the face of escalating partisan manipulation whose compatibility with this Nation's values and law no one defends—the majority declines to provide any remedy. For the first time in this Nation's history, the majority declares that it can do nothing about an acknowledged constitutional violation because it has searched high and low and cannot find a workable legal standard to apply.

The majority gives two reasons for thinking that the adjudication of partisan gerrymandering claims is beyond judicial capabilities.  First and foremost, the majority says, it cannot find a neutral baseline—one not based on contestable notions of political fairness—from which to measure injury.  See *ante,* at 15–19.  According to the majority, "[p]artisan gerrymandering claims invariably sound in a desire for proportional representation." *Ante,* at 16.  But the Constitution does not mandate proportional representation.  So, the majority contends, resolving those claims "inevitably" would require courts to decide what is "fair" in the context of districting.  *Ante,* at 17.  They would have "to make their own political judgment about how much representation particular political parties *deserve*" and "to rearrange the challenged districts to achieve that end."  *Ibid.* (emphasis in original).  And second, the majority argues that even after establishing a baseline, a court would have no way to answer "the determinative question: 'How much is too much?'"  *Ante,* at 19.  No "discernible and manageable" standard is available, the majority claims—and so courts could willy-nilly become embroiled in fixing every districting plan.  *Ante,* at 20; see *ante,* at 15–16.

I'll give the majority this one—and important—thing: It identifies some dangers everyone should want to avoid. Judges should not be apportioning political power based on their own vision of electoral fairness, whether proportional representation or any other.  And judges should not

be striking down maps left, right, and center, on the view that every smidgen of politics is a smidgen too much. Respect for state legislative processes—and restraint in the exercise of judicial authority—counsels intervention in only egregious cases.

But in throwing up its hands, the majority misses something under its nose: What it says can't be done *has* been done. Over the past several years, federal courts across the country—including, but not exclusively, in the decisions below—have largely converged on a standard for adjudicating partisan gerrymandering claims (striking down both Democratic and Republican districting plans in the process). See also *Ohio A. Philip Randolph Inst.*, 373 F. Supp. 3d 978; *League of Women Voters of Michigan* v. *Benson*, 373 F. Supp. 3d 867 (ED Mich. 2019). And that standard does what the majority says is impossible. The standard does not use any judge-made conception of electoral fairness—either proportional representation or any other; instead, it takes as its baseline a State's *own* criteria of fairness, apart from partisan gain. And by requiring plaintiffs to make difficult showings relating to both purpose and effects, the standard invalidates the most extreme, but only the most extreme, partisan gerrymanders.

Below, I first explain the framework courts have developed, and describe its application in these two cases. Doing so reveals in even starker detail than before how much these partisan gerrymanders deviated from democratic norms. As I lay out the lower courts' analyses, I consider two specific criticisms the majority levels—each of which reveals a saddening nonchalance about the threat such districting poses to self-governance. All of that lays the groundwork for then assessing the majority's more general view, described above, that judicial policing in this area cannot be either neutral or restrained. The lower courts' reasoning, as I'll show, proves the opposite.

A

Start with the standard the lower courts used. The majority disaggregates the opinions below, distinguishing the one from the other and then chopping up each into "a number of 'tests.'" *Ante,* at 22; see *ante,* at 22–30. But in doing so, it fails to convey the decisions' most significant—and common—features. Both courts focused on the harm of vote dilution, see *supra,* at 11, though the North Carolina court mostly grounded its analysis in the Fourteenth Amendment and the Maryland court in the First. And both courts (like others around the country) used basically the same three-part test to decide whether the plaintiffs had made out a vote dilution claim. As many legal standards do, that test has three parts: (1) intent; (2) effects; and (3) causation. First, the plaintiffs challenging a districting plan must prove that state officials' "predominant purpose" in drawing a district's lines was to "entrench [their party] in power" by diluting the votes of citizens favoring its rival. *Rucho*, 318 F. Supp. 3d, at 864 (quoting *Arizona State Legislature*, 576 U. S., at ___ (slip op., at 1)). Second, the plaintiffs must establish that the lines drawn in fact have the intended effect by "substantially" diluting their votes. *Lamone*, 348 F. Supp. 3d, at 498. And third, if the plaintiffs make those showings, the State must come up with a legitimate, non-partisan justification to save its map. See *Rucho*, 318 F. Supp. 3d, at 867.[2] If you are a lawyer, you know that this test looks utterly ordinary. It is the sort of thing courts work with every day.

Turn now to the test's application. First, did the North Carolina and Maryland districters have the predominant

---

[2] Neither North Carolina nor Maryland offered much of an alternative explanation for the evidence that the plaintiffs put forward. Presumably, both States had trouble coming up with something. Like the majority, see *ante,* at 25, I therefore pass quickly over this part of the test.

purpose of entrenching their own party in power? Here, the two District Courts catalogued the overwhelming direct evidence that they did. To remind you of some highlights, see *supra,* at 4–6: North Carolina's redistricting committee used "Partisan Advantage" as an official criterion for drawing district lines. And from the first to the last, that committee's chair (along with his mapmaker) acted to ensure a 10–3 partisan split, whatever the statewide vote, because he thought that "electing Republicans is better than electing Democrats." For their part, Maryland's Democrats—the Governor, senior Congressman, and State Senate President alike—openly admitted to a single driving purpose: flip the Sixth District from Republican to Democratic. They did not blanch from moving some 700,000 voters into new districts (when one-person-one-vote rules required relocating just 10,000) for that reason and that reason alone.

The majority's response to the District Courts' purpose analysis is discomfiting. The majority does not contest the lower courts' findings; how could it? Instead, the majority says that state officials' intent to entrench their party in power is perfectly "permissible," even when it is the predominant factor in drawing district lines. *Ante,* at 23. But that is wrong. True enough, that the intent to inject "political considerations" into districting may not raise any constitutional concerns. In *Gaffney* v. *Cummings,* 412 U. S. 735 (1973), for example, we thought it nonproblematic when state officials used political data to ensure rough proportional representation between the two parties. And true enough that even the naked purpose to gain partisan advantage may not rise to the level of constitutional notice when it is not the driving force in mapmaking or when the intended gain is slight. See *Vieth,* 541 U. S., at 286 (plurality opinion). But when political actors have a specific and predominant intent to entrench themselves in power by manipulating district lines, that goes

too far.  Consider again Justice Kennedy's hypothetical of mapmakers who set out to maximally burden (*i.e.,* make count for as little as possible) the votes going to a rival party.  See *supra,* at 12.  Does the majority really think that goal is permissible?  But why even bother with hypotheticals?  Just consider the purposes here.  It cannot be permissible and thus irrelevant, as the majority claims, that state officials have as their purpose the kind of grotesquely gerrymandered map that, according to all this Court has ever said, violates the Constitution.  See *supra,* at 13.

On to the second step of the analysis, where the plaintiffs must prove that the districting plan substantially dilutes their votes.  The majority fails to discuss most of the evidence the District Courts relied on to find that the plaintiffs had done so.  See *ante,* at 23–24.  But that evidence—particularly from North Carolina—is the key to understanding both the problem these cases present and the solution to it they offer.  The evidence reveals just how bad the two gerrymanders were (in case you had any doubts).  And it shows how the same technologies and data that today facilitate extreme partisan gerrymanders also enable courts to discover them, by exposing just how much they dilute votes.  See *Vieth*, 541 U. S., at 312–313 (opinion of Kennedy, J.) (predicting that development).

Consider the sort of evidence used in North Carolina first.  There, the plaintiffs demonstrated the districting plan's effects mostly by relying on what might be called the "extreme outlier approach."  (Here's a spoiler: the State's plan was one.)  The approach—which also has recently been used in Michigan and Ohio litigation—begins by using advanced computing technology to randomly generate a large collection of districting plans that incorporate the State's physical and political geography and meet its declared districting criteria, *except for* partisan gain.  For each of those maps, the method then uses

actual precinct-level votes from past elections to determine a partisan outcome (*i.e.,* the number of Democratic and Republican seats that map produces). Suppose we now have 1,000 maps, each with a partisan outcome attached to it. We can line up those maps on a continuum—the most favorable to Republicans on one end, the most favorable to Democrats on the other.[3] We can then find the median outcome—that is, the outcome smack dab in the center—in a world with no partisan manipulation. And we can see where the State's actual plan falls on the spectrum—at or near the median or way out on one of the tails? The further out on the tail, the more extreme the partisan distortion and the more significant the vote dilution. See generally Brief for Eric S. Lander as *Amicus Curiae* 7–22.

Using that approach, the North Carolina plaintiffs offered a boatload of alternative districting plans—all showing that the State's map was an out-out-out-outlier. One expert produced 3,000 maps, adhering in the way described above to the districting criteria that the North Carolina redistricting committee had used, other than partisan advantage. To calculate the partisan outcome of those maps, the expert also used the same election data (a composite of seven elections) that Hofeller had employed when devising the North Carolina plan in the first instance. The results were, shall we say, striking. Every single one of the 3,000 maps would have produced at least one more Democratic House Member than the State's actual map, and 77% would have elected three or four more. See *Rucho*, 318 F. Supp. 3d, at 875–876, 894; App.

---

[3] As I'll discuss later, this distribution of outcomes provides what the majority says does not exist—a neutral comparator for the State's own plan. See *ante,* at 16–19; *supra,* at 14; *infra*, at 22–25. It essentially answers the question: In a State with these geographic features and this distribution of voters and this set of districting criteria—but without partisan manipulation—what would happen?

276. A second expert obtained essentially the same results with maps conforming to more generic districting criteria (*e.g.,* compactness and contiguity of districts). Over 99% of that expert's 24,518 simulations would have led to the election of at least one more Democrat, and over 70% would have led to two or three more. See *Rucho,* 318 F. Supp. 3d, at 893–894. Based on those and other findings, the District Court determined that the North Carolina plan substantially dilutes the plaintiffs' votes.[4]

Because the Maryland gerrymander involved just one district, the evidence in that case was far simpler—but no less powerful for that. You've heard some of the numbers before. See *supra,* at 6. The 2010 census required only a minimal change in the Sixth District's population—the subtraction of about 10,000 residents from more than 700,000. But instead of making a correspondingly minimal adjustment, Democratic officials reconfigured the entire district. They moved 360,000 residents out and another 350,000 in, while splitting some counties for the first time in almost two centuries. The upshot was a district with 66,000 fewer Republican voters and 24,000 more Democratic ones. In the old Sixth, 47% of registered voters were Republicans and only 36% Democrats. But in the new Sixth, 44% of registered voters were Democrats and only 33% Republicans. That reversal of the district's partisan composition translated into four consecutive Democratic victories, including in a wave election year for

--------

[4] The District Court also relied on actual election results (under both the new plan and the similar one preceding it) and on mathematical measurements of the new plan's "partisan asymmetry." See *Rucho*, 318 F. Supp. 3d, at 884–895. Those calculations assess whether supporters of the two parties can translate their votes into representation with equal ease. See Stephanopoulos & McGhee, The Measure of a Metric, 70 Stan. L. Rev. 1503, 1505–1507 (2018). The court found that the new North Carolina plan led to extreme asymmetry, compared both to plans used in the rest of the country and to plans previously used in the State. See *Rucho*, 318 F. Supp. 3d, at 886–887, 892–893.

Republicans (2014). In what was once a party stronghold, Republicans now have little or no chance to elect their preferred candidate. The District Court thus found that the gerrymandered Maryland map substantially dilutes Republicans' votes. See *Lamone,* 348 F. Supp. 3d, at 519–520.

The majority claims all these findings are mere "prognostications" about the future, in which no one "can have any confidence." *Ante,* at 23 (internal quotation marks omitted). But the courts below did not gaze into crystal balls, as the majority tries to suggest. Their findings about these gerrymanders' effects on voters—both in the past and predictably in the future—were evidence-based, data-based, statistics-based. Knowledge-based, one might say. The courts did what anyone would want a decisionmaker to do when so much hangs in the balance. They looked hard at the facts, and they went where the facts led them. They availed themselves of all the information that mapmakers (like Hofeller and Hawkins) and politicians (like Lewis and O'Malley) work so hard to amass and then use to make every districting decision. They refused to content themselves with unsupported and out-of-date musings about the unpredictability of the American voter. See *ante,* at 24–25; but see Brief for Political Science Professors as *Amici Curiae* 14–20 (citing chapter and verse to the contrary). They did not bet America's future—as today the majority does—on the idea that maps constructed with so much expertise and care to make electoral outcomes impervious to voting would somehow or other come apart. They looked at the evidence—at the facts about how these districts operated—and they could reach only one conclusion. By substantially diluting the votes of citizens favoring their rivals, the politicians of one party had succeeded in entrenching themselves in office. They had beat democracy.

B

The majority's broadest claim, as I've noted, is that this is a price we must pay because judicial oversight of partisan gerrymandering cannot be "politically neutral" or "manageable." *Ante,* at 19; see *supra,* at 14. Courts, the majority argues, will have to choose among contested notions of electoral fairness. (Should they take as the ideal mode of districting proportional representation, many competitive seats, adherence to traditional districting criteria, or so forth?) See *ante,* at 16–19. And even once courts have chosen, the majority continues, they will have to decide "[h]ow much is too much?"—that is, how much deviation from the chosen "touchstone" to allow? *Ante,* at 19–20. In answering that question, the majority surmises, they will likely go far too far. See *ante,* at 15. So the whole thing is impossible, the majority concludes. To prove its point, the majority throws a bevy of question marks on the page. (I count nine in just two paragraphs. See *ante,* at 19–20.) But it never tries to analyze the serious question presented here—whether the kind of standard developed below falls prey to those objections, or instead allows for neutral and manageable oversight. The answer, as you've already heard enough to know, is the latter. That kind of oversight is not only possible; it's been done.

Consider neutrality first. Contrary to the majority's suggestion, the District Courts did not have to—and in fact did not—choose among competing visions of electoral fairness. That is because they did not try to compare the State's actual map to an "ideally fair" one (whether based on proportional representation or some other criterion). Instead, they looked at the difference between what the State did and what the State would have done if politicians hadn't been intent on partisan gain. Or put differently, the comparator (or baseline or touchstone) is the result not of a judge's philosophizing but of the State's own

characteristics and judgments. The effects evidence in these cases accepted as a given the State's physical geography (*e.g.,* where does the Chesapeake run?) and political geography (*e.g.,* where do the Democrats live on top of each other?). So the courts did not, in the majority's words, try to "counteract 'natural' gerrymandering caused, for example, by the urban concentration of one party." *Ante,* at 19. Still more, the courts' analyses used the State's own criteria for electoral fairness—except for naked partisan gain. Under their approach, in other words, the State selected its own fairness baseline in the form of its other districting criteria. All the courts did was determine how far the State had gone off that track because of its politicians' effort to entrench themselves in office.

The North Carolina litigation well illustrates the point. The thousands of randomly generated maps I've mentioned formed the core of the plaintiffs' case that the North Carolina plan was an "extreme[] outlier." *Rucho*, 318 F. Supp. 3d, at 852 (internal quotation marks omitted); see *supra*, at 18–20. Those maps took the State's political landscape as a given. In North Carolina, for example, Democratic voters are highly concentrated in cities. That fact was built into all the maps; it became part of the baseline. See *Rucho*, 318 F. Supp. 3d, at 896–897. On top of that, the maps took the State's legal landscape as a given. They incorporated the State's districting priorities, excluding partisanship. So in North Carolina, for example, all the maps adhered to the traditional criteria of contiguity and compactness. See *supra,* at 19–20. But the comparator maps in another State would have incorporated different objectives—say, the emphasis Arizona places on competitive districts or the requirement Iowa imposes that counties remain whole. See Brief for Mathematicians et al. as *Amici Curiae* 19–20. The point is that the assemblage of maps, reflecting the characteristics and

judgments of the State itself, creates a neutral baseline from which to assess whether partisanship has run amok. Extreme outlier as to what?  As to the other maps the State could have produced given its unique political geography and its chosen districting criteria.  *Not* as to the maps a judge, with his own view of electoral fairness, could have dreamed up.

The Maryland court lacked North Carolina's fancy evidence, but analyzed the gerrymander's effects in much the same way—not as against an ideal goal, but as against an *ex ante* baseline.  To see the difference, shift gears for a moment and compare Maryland and Massachusetts—both of which (aside from Maryland's partisan gerrymander) use traditional districting criteria.  In those two States alike, Republicans receive about 35% of the vote in statewide elections.  See Almanac of American Politics 2016, at 836, 880.  But the political geography of the States differs.  In Massachusetts, the Republican vote is spread evenly across the State; because that is so, districting plans (using traditional criteria of contiguity and compactness) consistently lead to an all-Democratic congressional delegation.  By contrast, in Maryland, Republicans are clumped—into the Eastern Shore (the First District) and the Northwest Corner (the old Sixth).  Claims of partisan gerrymandering in those two States could come out the same way if judges, à la the majority, used their own visions of fairness to police districting plans; a judge in each State could then insist, in line with proportional representation, that 35% of the vote share entitles citizens to around that much of the delegation.  But those suits would not come out the same if courts instead asked: What would have happened, given the State's natural political geography and chosen districting criteria, had officials not indulged in partisan manipulation?  And that is what the District Court in Maryland inquired into.  The court did not strike down the new Sixth District because a judicial

ideal of proportional representation commanded another Republican seat. It invalidated that district because the quest for partisan gain made the State override *its own* political geography and districting criteria. So much, then, for the impossibility of neutrality.

The majority's sole response misses the point. According to the majority, "it does not make sense to use" a State's own (non-partisan) districting criteria as the baseline from which to measure partisan gerrymandering because those criteria "will vary from State to State and year to year." *Ante,* at 27. But that is a virtue, not a vice—a feature, not a bug. Using the criteria the State itself has chosen at the relevant time prevents any judicial predilections from affecting the analysis—exactly what the majority claims it wants. At the same time, using those criteria enables a court to measure just what it should: the extent to which the pursuit of partisan advantage—by these legislators at this moment—has distorted the State's districting decisions. Sure, different non-partisan criteria could result, as the majority notes, in different partisan distributions to serve as the baseline. *Ante,* at 28. But that in itself raises no issue: Everyone agrees that state officials using non-partisan criteria (*e.g.,* must counties be kept together? should districts be compact?) have wide latitude in districting. The problem arises only when legislators or mapmakers substantially deviate from the baseline distribution by manipulating district lines for partisan gain. So once again, the majority's analysis falters because it equates the demand to eliminate partisan gerrymandering with a demand for a single partisan distribution—the one reflecting proportional representation. See *ante,* at 16–17. But those two demands are different, and only the former is at issue here.

The majority's "how much is too much" critique fares no better than its neutrality argument. How about the following for a first-cut answer: This much is too much. By

any measure, a map that produces a greater partisan skew than any of 3,000 randomly generated maps (all with the State's political geography and districting criteria built in) reflects "too much" partisanship. Think about what I just said: The absolute worst of 3,001 possible maps. The *only one* that could produce a 10–3 partisan split even as Republicans got a bare majority of the statewide vote. And again: How much is too much? This much is too much: A map that without any evident non-partisan districting reason (to the contrary) shifted the composition of a district from 47% Republicans and 36% Democrats to 33% Republicans and 42% Democrats. A map that in 2011 was responsible for the largest partisan swing of a congressional district in the country. See *Lamone,* 348 F. Supp. 3d, at 519. Even the majority acknowledges that "[t]hese cases involve blatant examples of partisanship driving districting decisions." *Ante,* at 27. If the majority had done nothing else, it could have set the line here. How much is too much? At the least, any gerrymanders as bad as these.

And if the majority thought that approach too case-specific, see *ante,* at 28, it could have used the lower courts' general standard—focusing on "predominant" purpose and "substantial" effects—without fear of indeterminacy. I do not take even the majority to claim that courts are incapable of investigating whether legislators mainly intended to seek partisan advantage. See *ante,* at 19–20 (focusing on the difficulty of measuring effects). That is for good reason. Although purpose inquiries carry certain hazards (which courts must attend to), they are a common form of analysis in constitutional cases. See, *e.g., Miller* v. *Johnson,* 515 U. S. 900, 916 (1995); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 533 (1993); *Washington* v. *Davis,* 426 U. S. 229, 239 (1976). Those inquiries would be no harder here than in other contexts.

Nor is there any reason to doubt, as the majority does, the competence of courts to determine whether a district map "substantially" dilutes the votes of a rival party's supporters from the everything-but-partisanship baseline described above. (Most of the majority's difficulties here really come from its idea that ideal visions set the baseline. But that is double-counting—and, as already shown, wrong to boot.) As this Court recently noted, "the law is full of instances" where a judge's decision rests on "estimating rightly . . . some matter of degree"—including the "substantial[ity]" of risk or harm. *Johnson* v. *United States*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 12) (internal quotation marks omitted); see, *e.g., Ohio* v. *American Express Co.*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 9) (determining "substantial anticompetitive effect[s]" when applying the Sherman Act); *United States* v. *Davis*, *ante,* at 7–10 (KAVANAUGH, J., dissenting) (cataloging countless statutes requiring a "substantial" risk of harm). The majority is wrong to think that these laws typically (let alone uniformly) further "confine[] and guide[]" judicial decisionmaking. *Ante,* at 28. They do not, either in themselves or through "statutory context." *Ibid.* To the extent additional guidance has developed over the years (as under the Sherman Act), courts themselves have been its author—as they could be in this context too. And contrary to the majority's suggestion, see *ibid.*, courts all the time make judgments about the substantiality of harm without reducing them to particular percentages. If courts are no longer competent to do so, they will have to relinquish, well, substantial portions of their docket.

And the combined inquiry used in these cases set the bar high, so that courts could intervene in the worst partisan gerrymanders, but no others. Or to say the same thing, so that courts could intervene in the kind of extreme gerrymanders that nearly every Justice for decades has thought to violate the Constitution. See *supra,* at 13.

Illicit purpose was simple to show here only because politicians and mapmakers thought their actions could not be attacked in court. See *Rucho,* 318 F. Supp. 3d, at 808 (quoting Lewis's statements to that effect). They therefore felt free to openly proclaim their intent to entrench their party in office. See *supra,* at 4–6. But if the Court today had declared that behavior justiciable, such smoking guns would all but disappear. Even assuming some officials continued to try implementing extreme partisan gerrymanders,[5] they would not brag about their efforts. So plaintiffs would have to prove the intent to entrench through circumstantial evidence—essentially showing that no other explanation (no geographic feature or nonpartisan districting objective) could explain the districting plan's vote dilutive effects. And that would be impossible unless those effects were even more than substantial—unless mapmakers had packed and cracked with abandon in unprecedented ways. As again, they did here. That the two courts below found constitutional violations does not mean their tests were unrigorous; it means that the conduct they confronted was constitutionally appalling—by even the strictest measure, inordinately partisan.

The majority, in the end, fails to understand both the plaintiffs' claims and the decisions below. Everything in today's opinion assumes that these cases grew out of a "desire for proportional representation" or, more generally phrased, a "fair share of political power." *Ante,* at 16, 21. And everything in it assumes that the courts below had to (and did) decide what that fair share would be. But that is

_____

[5] A decision of this Court invalidating the North Carolina and Maryland gerrymanders would of course have curbed much of that behavior. In districting cases no less than others, officials respond to what this Court determines the law to sanction. See, *e.g.,* Charles & Fuentes-Rohwer, Judicial Intervention as Judicial Restraint, 132 Harv. L. Rev. 236, 269 (2018) (discussing how the Court's prohibition of racial gerrymanders affected districting).

not so. The plaintiffs objected to one specific practice—the extreme manipulation of district lines for partisan gain. Elimination of that practice could have led to proportional representation. Or it could have led to nothing close. What was left after the practice's removal could have been fair, or could have been unfair, by any number of measures. That was not the crux of this suit. The plaintiffs asked only that the courts bar politicians from entrenching themselves in power by diluting the votes of their rivals' supporters. And the courts, using neutral and manageable—and eminently legal—standards, provided that (and only that) relief. This Court should have cheered, not overturned, that restoration of the people's power to vote.

## III

This Court has long understood that it has a special responsibility to remedy violations of constitutional rights resulting from politicians' districting decisions. Over 50 years ago, we committed to providing judicial review in that sphere, recognizing as we established the one-person-one-vote rule that "our oath and our office require no less." *Reynolds*, 377 U. S., at 566. Of course, our oath and our office require us to vindicate all constitutional rights. But the need for judicial review is at its most urgent in cases like these. "For here, politicians' incentives conflict with voters' interests, leaving citizens without any political remedy for their constitutional harms." *Gill*, 585 U. S., at \_\_\_ (KAGAN, J., concurring) (slip op., at 14). Those harms arise because politicians want to stay in office. No one can look to them for effective relief.

The majority disagrees, concluding its opinion with a paean to congressional bills limiting partisan gerrymanders. "Dozens of [those] bills have been introduced," the majority says. *Ante,* at 33. One was "introduced in 2005 and has been reintroduced in every Congress since." *Ibid.*

And might be reintroduced until the end of time. Because what all these *bills* have in common is that they are not *laws*. The politicians who benefit from partisan gerrymandering are unlikely to change partisan gerrymandering. And because those politicians maintain themselves in office through partisan gerrymandering, the chances for legislative reform are slight.

No worries, the majority says; it has another idea. The majority notes that voters themselves have recently approved ballot initiatives to put power over districting in the hands of independent commissions or other nonpartisan actors. See *ante,* at 32. Some Members of the majority, of course, once thought such initiatives unconstitutional. See *Arizona State Legislature,* 576 U. S., at ___ (ROBERTS, C. J., dissenting) (slip op., at 1). But put that aside. Fewer than half the States offer voters an opportunity to put initiatives to direct vote; in all the rest (including North Carolina and Maryland), voters are dependent on legislators to make electoral changes (which for all the reasons already given, they are unlikely to do). And even when voters have a mechanism they can work themselves, legislators often fight their efforts tooth and nail. Look at Missouri. There, the majority touts a voter-approved proposal to turn districting over to a state demographer. See *ante,* at 32. But before the demographer had drawn a single line, Members of the state legislature had introduced a bill to start undoing the change. See Mo. H. J. Res. 48, 100th Gen. Assembly, 1st Reg. Sess. (2019). I'd put better odds on that bill's passage than on all the congressional proposals the majority cites.

The majority's most perplexing "solution" is to look to state courts. *Ante,* at 30. "[O]ur conclusion," the majority states, does not "condemn complaints about districting to echo into a void": Just a few years back, "the Supreme Court of Florida struck down that State's congressional districting plan as a violation" of the State Constitution.

KAGAN, J., dissenting

*Ante,* at 31; see *League of Women Voters of Florida* v. *Detzner*, 172 So. 3d 363 (2015). And indeed, the majority might have added, the Supreme Court of Pennsylvania last year did the same thing. See *League of Women Voters*, \_\_\_ Pa., at \_\_\_, 178 A. 3d, at 818. But what do those courts know that this Court does not? If they can develop and apply neutral and manageable standards to identify unconstitutional gerrymanders, why couldn't we?[6]

We could have, and we should have. The gerrymanders here—and they are typical of many—violated the constitutional rights of many hundreds of thousands of American citizens. Those voters (Republicans in the one case, Democrats in the other) did not have an equal opportunity to participate in the political process. Their votes counted for far less than they should have because of their partisan affiliation. When faced with such constitutional wrongs, courts must intervene: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). That is what the courts below did. Their decisions are worth a read. They (and others that have recently remedied similar violations) are detailed, thorough, painstaking. They

—————

[6] Contrary to the majority's suggestion, state courts do not typically have more specific "standards and guidance" to apply than federal courts have. *Ante*, at 31. The Pennsylvania Supreme Court based its gerrymandering decision on a constitutional clause providing only that "elections shall be free and equal" and no one shall "interfere to prevent the free exercise of the right of suffrage." *League of Women Voters*, \_\_\_ Pa., at \_\_\_–\_\_\_, 178 A. 3d, at 803–804 (quoting Pa. Const., Art. I, §5). And even the Florida "Free Districts Amendment," which the majority touts, says nothing more than that no districting plan "shall be drawn with the intent to favor or disfavor a political party." Fla. Const., Art. III, §20(a). If the majority wants the kind of guidance that will keep courts from intervening too far in the political sphere, see *ante,* at 15, that Amendment does not provide it: The standard is in fact a good deal less exacting than the one the District Courts below applied. In any event, only a few States have a constitutional provision like Florida's, so the majority's state-court solution does not go far.

evaluated with immense care the factual evidence and legal arguments the parties presented. They used neutral and manageable and strict standards. They had not a shred of politics about them. Contra the majority, see *ante,* at 34, this *was* law.

That is not to deny, of course, that these cases have great political consequence. They do. Among the *amicus* briefs here is one from a bipartisan group of current and former Members of the House of Representatives. They describe all the ways partisan gerrymandering harms our political system—what they call "a cascade of negative results." Brief as *Amicus Curiae* 5. These artificially drawn districts shift influence from swing voters to party-base voters who participate in primaries; make bipartisanship and pragmatic compromise politically difficult or impossible; and drive voters away from an ever more dysfunctional political process. See *id.,* at 5–6. Last year, we heard much the same from current and former state legislators. In their view, partisan gerrymandering has "sounded the death-knell of bipartisanship," creating a legislative environment that is "toxic" and "tribal." Brief as *Amicus Curiae* in *Gill* v. *Whitford*, O. T. 2016, No. 16–1161, pp. 6, 25. Gerrymandering, in short, helps create the polarized political system so many Americans loathe.

And gerrymandering is, as so many Justices have emphasized before, anti-democratic in the most profound sense. See *supra,* at 7–8. In our government, "all political power flows from the people." *Arizona State Legislature,* 576 U. S., at ___ (slip op., at 35). And that means, as Alexander Hamilton once said, "that the people should choose whom they please to govern them." 2 Debates on the Constitution 257 (J. Elliot ed. 1891). But in Maryland and North Carolina they cannot do so. In Maryland, election in and election out, there are 7 Democrats and 1 Republican in the congressional delegation. In North Carolina, however the political winds blow, there are 10

KAGAN, J., dissenting

Republicans and 3 Democrats. Is it conceivable that someday voters will be able to break out of that prefabricated box? Sure. But everything possible has been done to make that hard. To create a world in which power does not flow from the people because they do not choose their governors.

Of all times to abandon the Court's duty to declare the law, this was not the one. The practices challenged in these cases imperil our system of government. Part of the Court's role in that system is to defend its foundations. None is more important than free and fair elections. With respect but deep sadness, I dissent.