**Dissenting Opinion Filed October 23, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-20-00560-CV

---

### SAMMY BICKHAM, JR., KRISTEN BICKHAM, AND KIRK LAUNIUS, Appellants
### V.
### DALLAS COUNTY, TEXAS, TONI PIPPINS-POOLE, IN HER OFFICIAL CAPACITY AS DALLAS COUNTY CENTRAL COUNTING STATION MANAGER, DANIEL BRADLEY, IN HIS OFFICIAL CAPACITY AS DALLAS COUNTY CENTRAL COUNTING STATION TABULATION SUPERVISOR,  NICOLAS MEVELLEC, IN HIS OFFICIAL CAPACITY AS DALLAS COUNTY CENTRAL COUNTING STATION ASSISTANT TABULATION SUPERVISOR, AND ELECTION SYSTEMS & SOFTWARE, LLC, Appellees

---

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-06162**

---

## DISSENTING OPINION
Before Chief Justice Burns, Justice Schenck, and Justice Osborne
Opinion by Justice Schenck

Appellants are voters appointed as poll "watchers" under Chapter 33 of the election code.  They assert, based on alleged experience in recent elections, that appellees—the county and officials responsible for conducting the count under observation—will materially impede their ability to assure an accurate and legal

count of the votes. Appellees assert that appellants lack standing over any such claim because, according to appellees, watchers are required to, and cannot, show an injury different in kind from all other voters. Neither side directs us to case law addressing whether a watcher's threatened injury of being deprived of access supports standing. I would find standing at this stage. Because the majority concludes otherwise, I dissent.

## Standard of Review

In view of our jurisdictional posture, we review the trial court's decision de novo, assume the truth of the appellant's factual averments, and ignore the merits of their allegations unless "the defendant pleads and proves that the allegations were fraudulently made to confer jurisdiction on the court." *Westbrook v. Horton*, No. 2-06-159-CV, 2007 WL 1299247, at *2 (Tex. App.—Ft. Worth May 3, 2007, no pet.) (mem. op.) (citation omitted); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Thus, "dismiss[al] . . . is proper only when it is impossible for the . . . petition to confer jurisdiction on the trial court." *HealthSouth Med. Ctr. v. Emp'rs Ins. Co. of Wausau*, 232 S.W.3d 828, 830 (Tex. App.—Dallas 2007, pet. denied). The presence of one party presenting a colorable claim supporting standing is enough to confer jurisdiction and move on to the merits. *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 6 n.9 (Tex. 2011).[1]

---

[1] Appellants have lodged multiple complaints relative to their ability to observe and attest to the accuracy of the count. Included in those complaints are allegations that they were "prevented from

–2–

**Summary**

The sole question before us is a legal one: is the judiciary open to voters or poll watchers seeking prospective relief from practices they allege, and we must assume at this stage, have the intent or the effect of impeding their ability to observe the count of the votes?  Appellees urge that appellants are obliged to show more than their constitutional standing.[2]  Rather, claim appellees, appellants must overcome the additional, prudential requirements of showing a special and unique injury apart from the general public and that as mere voters and watchers they cannot do so.

Because counting the votes is integral to the election process, and laws aimed at observing the votes can only be intended to avoid (or deter) the dilution of the lawful vote, I believe *any* voter within the reach of the count, and certainly one appointed as a "watcher" of it, has standing to complain of threatened dilution.  That principle was established in the watershed decision of *Baker v. Carr*, 369 U.S. 186, 206 (1962), and governs in our courts as well.  *See Andrade*, 345 S.W.3d at 8.

---

monitoring activities occurring on Defendant[']s private laptop when the laptop is obstructed from their view and removed from the premises" and that same computer is later returned to the premises prior to election day.  I would conclude that not every election observation allegation, accepted as true, would necessarily amount to a colorable claim for these purposes.  Appellants' allegation regarding the frequency and duration of restroom breaks, for example, could be readily defeated as non-justiciable by stipulation or adoption of guidelines assuring observers a functional ability to observe the count.  At this stage, however, we accept all allegations as true.

[2] The "irreducible constitutional minimum" of standing focuses on the plaintiff alleging (1) an actual or imminent "injury in fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that would likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("[W]e may look to the similar federal standing requirements for guidance.").

Separately, even if these claims were subject to the additional, prudential standing requirements of a more particularized injury, that unique injury is clear. In any later contest of the legitimacy of the election, poll "watchers" alone would be available as witnesses independent of the officials whose conduct is challenged. Denying or obstructing their view of the count directly hampers their ability to act as witnesses or otherwise speak on behalf of the candidate or party who appointed them. This is an injury that they—and no other voter—can claim.

Finally, I reject as absurd, and likely unconstitutional, appellees' argument that the remedy for any of the obstructions that we must assume here lies with local executive branch officials or the candidates or political parties. The process by which the election is conducted—as opposed to its results—is primarily, if not exclusively, the concern of the voters—not the political parties, their candidates or officeholders. The latter are tenants at sufferance of the former. It is for these reasons that direct standing of voters who claim to be affected by a threat to their vote (much less those separately appointed to safeguard it) was recognized in *Baker v. Carr*.

## I. The Threatened Injury Here Is One that Has Long Been Recognized to Support Standing Directly

Until the votes are counted and the results are declared, the interests of the candidates and the political parties are contingent. The election itself and the process by which it is conducted, including and especially the question of whose vote will

be counted, is directly the concern of the voters.[3] The election, like the offices under consideration, belong to them—not to the parties or their candidates.

Threatened injury in the form of dilution, i.e., of not actually counting some votes or counting them alongside others that should not be counted, falls firstly on the voters themselves and amounts to an injury in fact. And, while that injury is shared among the voters, it supports standing directly, as it must. *See Baker*, 369 U.S. at 206; *Andrade*, 345 S.W.3d at 8.[4] That injury is independent of the result of the total tabulation. *Andrade*, 345 S.W.3d at 8. Thus, it is the candidates—and not the voters—who would lack standing to complain *pre-election* of whose vote might or might not be counted. *Roberts*, 883 F.2d at 621; *Giles v. Ashcroft*, 193 F. Supp. 2d 258, 264 (D.D.C. 2002).

Conversely, *after* the election, it is the candidates, not the voters, whose interests are primarily at stake. TEX. ELEC. CODE § 232.002 ("Any *candidate* in an election may contest the election.") (emphasis added); *see also id.* § 232.003–.008. Should a candidate decide to mount such a challenge, he or she will be heard only

---

[3] Appellees appear to concede that the candidates and political parties who appointed the voters as watchers might have standing to bring a claim in advance of the election. I wonder aloud how that might be. Other than as voters themselves—a status said to be insufficient to confer standing—candidates' standing could only be derivative or representative of those same voters. *Compare Veasey v. Perry*, 29 F. Supp. 3d 896, 910–11 (S.D. Tex. 2014) (voter enjoys direct standing to seek prospective relief challenging pre-election suppression claim) *with id.* at 908 (organizations and candidates generally lack direct standing to assert claims affecting the right to vote because "[t]he right to vote implicated by the pleadings is a right afforded to voters") (citing *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989)).

[4] It is of course the threatened injury—and not the label of the claim—that determines standing. *See Andrade*, 345 S.W.3d at 10 (citing *Baker*, 369 U.S. at 207–08) (relevant inquiry is whether plaintiffs assert legally cognizable injury).

to the extent he or she can prove that the number of votes illegally cast (or illegally discarded) would change the result. *Infra.* The interests of the wholly or partially disenfranchised voter, at that point, will be pursued only at the choice of a candidate, and remedy for the injury will rest on the candidate's fate.

It is for this reason that our supreme court has been careful to distinguish between claims of voter standing to challenge the results of an election, on the one hand, and the process, on the other. *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001); *Blum v. Lanier*, 997 S.W.2d 259, 262–64 (Tex. 1999). The voter's interest in his or her vote and in having it counted is separate from (and does not belong to) any candidate or party. While I am aware of no decision of this Court or our supreme court saying so, it seems obvious that the counting, or perhaps even the "recounting" of votes, prior to the announcement of the result is an integral part of the process. *E.g.*, *Meyer v. Lamm*, 846 P.2d 862, 870–71 (Colo. 1993) (collecting like holdings of courts in other states across the country).[5]

Vote dilution claims are most often litigated as more abstract arguments about the possible effects of malapportionment, configuration of political districts, or

---

[5] Notably, and in keeping with the standing rules announced in *Baker*, *Andrade*, and like cases, the candidate claiming standing in *Meyer* alleged she was "a resident and eligible voter in Colorado State House District Number 13. She is also a candidate for that position. On November 3, 1992, she voted for herself to be the State Representative." *Meyer*, 846 P2d at 865 n.3. She was joined by another voter who alleged standing as "a resident and eligible voter for Colorado State House District Number 13. He cast a vote for 'Mrs. Lamm' and either has been or will be disenfranchised if his vote is not counted on November 20, 1992 at the mandatory recount." *Id.*

conditions on the right to cast a ballot. The notion that some votes that have been cast will not be counted or that others might be counted improperly is the most extreme and obvious violation of the "one person, one vote" assurance of *Baker*. As someone once observed: "Those who cast the votes decide nothing. Those who count the votes decide everything."[6]

Indeed, the entire and sole evident purpose of Chapter 33's creation of the office of poll "watcher" was to avoid the very injury *Andrade* and *Baker* recognize as sufficient to support standing. Reflecting an appreciation for this (and of whose interests and potential injuries are of primary importance here), the legislature, mandated that *only voters* could serve as poll watchers and, at the same time, barred any candidate from serving in that capacity. ELEC. § 33.031–.032. While appellants claim standing as poll "watchers" without urging that all such watchers are, by definition, also voters, I fail to see how that additional status *detracts* from their standing. Poll watchers may be appointed by and acting on behalf of a candidate or a political party, but the interests they advance most directly are their own.

All of this was obvious in 1962 when the United States Supreme Court declared that the voters' right to vote was worthy of judicial protection directly and

---

[6] This quotation is often attributed, rightly or wrongly, to Joseph Stalin. Concerns over vote dilution by inadequate safeguards over the counting are alive and well in Texas and elsewhere. *See, e.g.*, Ginger Thompson, *Ex-President in Mexico Casts New Light on Rigged 1988 Election*, NEW YORK TIMES, Mar. 9, 2004 (detailing ruling PRI party falsely announcing failure of electronic counting system and subsequent burning of the paper ballots); *see also* Dan Balz, *The Mystery of Ballot Box 13*, WASHINGTON POST, Mar. 4, 1990.

on its own account, despite the injury being generally shared by all of them. I would think it was equally obvious more recently and closer to home when our own supreme court held the same in *Andrade* and in *Blum*, where it rejected an election contest as the exclusive remedy for pre-election controversies that might be avoided by injunction actions brought directly by voters themselves. *See Blum*, 997 S.W.2d at 263–64 ("In short, if the matter is one that can be judicially resolved in time to correct deficiencies in the ballot without delaying the election, then injunctive relief may provide a remedy that cannot be adequately obtained through an election contest.").

Chapter 33's provisions for appointing some voters as "watchers" assures the whole of the electorate that someone will have the effective ability to dispel allegations of malfeasance, or, less often one would hope, to serve as witnesses to it thereafter. It also, if less directly, protects the interests of the candidates, the parties, and the local election officials themselves who will (or would) be protected from potentially spurious claims of misconduct, firstly, by the permitting full, lawful access to those entitled to observe and, secondly, by judicial confirmation of the lawfulness of their process.

I therefore reject the idea that standing in this context requires plunging into prudential considerations and searching for an injury different in type from that suffered by others. If local election officials, strapped for cash, announced that all voters would be required to pay a $10 tax as a condition of voting, I would concede

that application of the tax would affect everyone. While the tax would obviously violate the Twenty-Fourth Amendment,[7] we could not reach the merits to say so without first addressing our jurisdiction. Likewise, if our next Governor were to find the results of his or her own election so pleasing that all future elections for the office should be cancelled, the deprivation would be statewide and universal in effect. Still, the lesson of *Baker*, as I will discuss further below, is that the judiciary, state or federal, cannot defer to local or state authorities on the broad scope of the actual or threatened injury. *See FEC v. Akins*, 524 U.S. 11, 24 (1998) ("where a harm is concrete, though widely shared, the Court has found 'injury in fact'").

Whether any of the present claims would "ultimately, entitle[] [appellants] to relief" is hardly clear at this stage. *Andrade*, 345 S.W.3d at 10. The sole question, however, is whether the nature of the impairment produces a legally cognizable injury. *Id.* (citing *Baker*, 369 U.S. at 207–08). I thus disagree with the majority's conclusion that the special exception practice is relevant, much less controlling of the standing question before us.[8] The injury claimed in this case—that local

---

[7] The Twenty-fourth Amendment states:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. CONST. amend. XXIV, § 1.

[8] As I read the record, appellees failed to specially except as to the nature of the injury or the title of the claims appellants asserted. Even had they done so, and even if those special exceptions had been granted, the title of the claim would be irrelevant. *See Andrade*, 345 S.W.3d at 10 (citing *Baker*, 369 U.S. at 207–08).

counting practices conflict with governing law and may result in an improper count—is surely shared by all voters alike and is legally cognizable as such regardless of the title affixed to the claim. Nevertheless, it is enough in and of itself to support the standing of *any voter*, much less one appointed as a "watcher," to come to court for redress. *See id.* (plaintiff voters had standing over claim of inability "to determine whether their votes were counted").

## II. Should a Poll Watcher's Standing Turn on the Presence of Injury Beyond the Obvious Potential Dilution, They Suffer It

The Legislature created the office of watcher, at least in substantial part, for the watcher to be available publicly to attest to the process, including in any later contest for office. Unlike the general public, or even other voters, poll watchers appointed to perform that function have (or are supposed to have) the unique ability to attest to the circumstances of the election process and the count. They alone would have the ability, either for themselves or for the candidate or party who appointed them, to publicly declare the process to have been suspect or, perhaps even more importantly, to rebut such a charge as false. It is, in fact, difficult to conceive of any other reason one would undertake that role.

Whether one focuses on the right to express one's opinion on the fairness of the process to the public via the print or electronic media or simply on the right to participate as a witness at a trial, either interest is legally cognizable. U.S. CONST. amend. I; *Roberts v. Mentzer*, 382 Fed. Appx. 158, 164 (3d Cir. 2010) (recognizing

right to appear and give true testimony as witness in legal proceeding is guaranteed by free speech clause of First Amendment); *Bonner v. Beto*, 373 F.2d 301 (5th Cir. 1967) (holding Texas statute prohibiting co-principal from appearing as witness violates due process rights). When permitted to observe the counting process in accordance with laws aimed at assuring meaningful scrutiny of the vote count, watchers, unlike other voters, can share that view. When unlawfully obstructed, they alone are deprived of that ability. Thus, to the extent further, unique injury is required to support their standing to assert a colorable claim that election officials will obstruct their ability to meaningfully observe the counting process, poll watchers alone suffer it.

Finally, though it should not be necessary in view of their own statutory status as voters and unique injury as "watchers," appellants may also be unique in their ability to assert third-party standing on behalf of the candidate or political party appointing them.[9] We generally examine standing in connection with the injury

---

[9] I readily concede that appellants have not raised this argument themselves. Nevertheless, as jurisdiction is an issue we are obliged to consider "sua sponte," *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 735 (Tex. App.—Dallas 2007, pet. denied), our review is not limited to the "precise jurisdictional challenges or arguments presented by the parties." *City of Dallas v. Sabine Rover Auth.*, No. 03-15-00371-CV, 2017 WL 2536882, at *7 (Tex. App.—Austin June 7, 2017, no pet.) (mem. op.). I am aware of no Texas authority to the contrary and no authority from any other jurisdiction to suggest that our duty to independently examine jurisdiction is directed only toward one result, leaving us obliged and free to explore for ourselves only the law and the record to avoid jurisdiction. *See Loachapoka Water Auth., Inc. v. Water Works Bd. of City of Auburn*, 74 So. 3d 419, 422 (Ala. 2011) (stating court "is not limited to the parties' arguments" and addressing jurisdiction "*ex mero metu*") (citation omitted); *Demming v. Demming*, 251 So. 3d 284, 286 (Fla. Dist. Ct. App. 2018); *Guembes v. Roberts*, 389 P.3d 507, 508 n.1 (Or. Ct. App. 2017); *Parrish v. FNMA*, 787 S.E.2d 116, 120 (Va. 2016); *see also Kamen v. Kemper Fin. Serv.*, 500 U.S. 90, 99 (1991); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (opinion for the court by Scalia, J.) (discussing court's authority to develop legal arguments generally and apart from jurisdictional issues).

suffered by the party alone. However, litigants under certain circumstances may raise a claim on behalf of a third party, like a candidate for office or political party, if (1) he or she has suffered a concrete, redressable injury; (2) he or she has a close relation with the third party; and (3) there exists some hindrance to the third party's ability to protect his or her own interests. *E.g.*, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 629–30 (1991) (holding that civil litigant has standing to raise claims of potential jurors who are removed pursuant to race based peremptory strikes).

As the Legislature has barred candidates from serving as watchers, ELEC. § 33.032, candidates can rely only on the eyes and ears of the person appointed to carry out that function. Should a candidate wish to pursue any subsequent contest (or mount a defense) related to the count, the appointed watcher will be the only witness available.

## III. Appellees' Argument that Redress for Actual or Presumed Irregularities Before the Election Lies Elsewhere Is Wrong

Appellees candidly conceded at argument that we must presume the allegations at issue to be true here as we would any allegation of obstruction of the observation of the vote count no matter how egregious. Nevertheless, they maintain that the remedy for obstructing poll watchers from watching the polls lies with a complaint to the election officials who are alleged to be obstructing the count, a complaint to the local district attorney for a possible criminal prosecution thereafter,

or a claim brought by the candidate or political party who appointed the watcher. I will take the last argument first.

Let us suppose that a poll watcher objects to conduct by election officials that either amounts directly to dilution of the vote (e.g., 100 valid ballots discarded) or that simply obstructs his ability to properly observe the count, like appellants' present allegation regarding the transposing of ballots onto a private computer before tabulation.[10] The watcher, having no standing of his own, is to report the problem to the candidate or the political party who appointed him so that the candidate or political party might decide whether to bring the matter to court. *But see Andrade*, 345 S.W.3d at 8; *Brown*, 53 S.W.3d at 302.

Appellees suggest that the appointing candidate or political party might bring an action before the election, but they do not explain the basis on which either would have standing at that stage except derivatively on behalf of the same voters who lack standing.[11] Neither do they attempt to explain how that claim would be ripe when pursued by a candidate who might lose by a margin greater than the 100 ballots subject to the challenge. While the candidate would surely have standing to file a

---

[10] As asserted by appellants, they were "directly harmed when they were prevented from monitoring activities occurring on Defendant[']s private laptop when the laptop is obstructed from their view and removed from the premises." Appellants further alleged "the Assistant to Tabulation Supervisor at the Central Counting Station . . . put Early Voting data onto [his laptop] before election day, remove[d] that computer from the Central Counting Station site, and return[ed] with it on subsequent days prior to election day."

[11] As noted *supra*, an action by the candidate brought before the election would appear to rely on the candidate's standing as a voter or in relation to other voters such an action would be precluded under appellees' argument.

–13–

contest for office after the election, again, no remedy would be available to the candidate in such an action unless the 100 votes known to be affected were sufficiently numerous that they could change the result. *See* ELEC. § 221.009(b); *O'Caña v. Salinas*, No. 13-18-00563-CV, 2019 WL 1414021, at \*4 (Tex. App.—Corpus Christi–Edinburg Mar. 29, 2019, pet. denied) (mem. op.).

And if, as here, the testimony that we are to assume to come from the poll watchers would amount to "I don't know how many votes were improperly included or improperly excluded because I was not allowed to properly observe what originally went on to the computer," what then? Would the court order a new election because a broad, but merely potential, lack of confidence in the outcome infects the result? Or would we treat the claim as failing for lack of actual proof?[12] Either way, the abuse, and the resulting injury to the voter, could continue unabated.

Appellees also urge that a poll watcher might direct their grievance to the local officials: that is to say, he could complain to the same local election officials he would accuse of mis- or malfeasance or to the local district attorney for possible criminal prosecution. The first is absurd. The second entails no possible remedy for either the election itself or the lost vote and, in all events, would leave any consequence for the structural political abuse to the discretion of local elected

---

[12] The ballots discovered in Box 13 in the 1948 Senate primary controversy were deemed sufficient to control the result, although "the last 202 names on the rolls were written in a different color ink; the new names were listed in alphabetical order; the handwriting was identical; and some of the new voters claimed they never voted." Dan Balz, *The Mystery of Ballot Box 13*, WASHINGTON POST, Mar. 4, 1990.

executive-branch officials in a manner that fatally ignores the role of the judiciary in a republican form of government.

Leaving the voters' right in their vote to the discretion of the local executive branch that is the subject of the challenge (or the political party(ies)) is precisely what led to the recognition of their direct standing in *Baker*,[13] the subsequent passage of the federal Voting Rights Act, and the resulting need for federal oversight of state elections for three generations.[14]

In the ensuing five decades, *any voter* alleging that state action threatened a practical dilution of his or her vote, whether from a malapportionment,[15] excessively

---

[13] In the decades before *Baker*, state judiciaries across the south deferred to their local executive officials and the political parties to oversee their own primaries. Election practices that threatened the ability to vote at all or to diminish its effect, most often on account of race, were held to be beyond the courts' jurisdiction. *See Bell v. Hill*, 74 S.W.2d 113, 122 (Tex. 1934); *City of Honey Springs v. Templeton*, 194 S.W.2d 620, 623 (Tex. App.—Dallas 1946, writ ref'd n.r.e.). That jurisdictional modesty facilitated widespread and chronic abuse of the electorate. In hindsight, it can only be described as an abdication and a structural failure to function as an independent branch under the republican form of government clauses in the state and federal constitutions, as *Baker* itself suggested. *See* TEX. CONST. art. 1, § 2; *see also* U.S. CONST. art. IV, § 4; *Baker*, 369 U.S. at 218–21.

[14] Because the state judiciaries could not be relied upon to enforce their own constitutions or voting laws, the federal government was compelled to undertake the "uncommon exercise of congressional power" of essentially divesting some of them of their sovereignty insofar as conducting elections was concerned. *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966). Reflecting their unprecedented nature, the most extreme aspects of this divestiture were set to expire in 1970. Instead, they were extended and expanded to include Texas and remained until 2013 when they were struck down in *Shelby County v. Holder*, 570 U.S. 529 (2013).

[15] *E.g.*, *Baker*, *supra*.

partisan gerrymander, [16] misconfiguration of his district,[17] suppression,[18] or potential mischief in the counting,[19] and, without regard to the label affixed to the claim, enjoyed direct standing to complain of the threat to his or her vote because of the alleged injury and not the title of his claim, and the court, state or federal, was the right place to lodge it. At this late date,[20] I would think the argument that the state judiciary should stand down in the face of imminent, if assumed, violations of their own state election laws aimed at assuring legitimacy of the count—because all voters face the same threatened abuse—would be quickly dismissed.

## Conclusion

The Legislature created the office of poll "watcher" to permit registered voters in the county to observe the ballot counting. *See* ELEC. § 33.031(a). The watcher's purpose is to ensure the integrity of the election, promote confidence in the announced result, avoid unnecessary controversy, and assure a functional means of establishing or rebutting claims of misconduct. The sole question presented here is whether poll watchers who come forward alleging an otherwise live claim of

---

[16] *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). The opinion begins with the following: "*Voters and other plaintiffs* . . . challenge[] their States' . . . districting maps as unconstitutional partisan gerrymanders . . . ." *Id.* at 2491.

[17] *Perry v. Perez*, 565 U.S. 388 (2012) (voter raising § 2 Voting Rights Act claim without reference to equal protection); *Perry v. Del Rio*, 66 S.W.3d 239 (Tex. 2001).

[18] *Veasey*, 29 F. Supp. 3d at 910.

[19] *Andrade*, 345 S.W.3d at 10.

[20] After 2013, it is the state judiciaries, not political parties, their candidates or local executives, who are responsible for these issues. *See Shelby County*, 570 U.S. at 556–57.

obstruction of their ability to observe the count have standing to have that claim settled in court.

Because the statute is aimed at avoiding the most extreme forms of vote dilution, I find cases recognizing standing in any affected voter, including and especially one appointed for the purpose of watching, to control. Separately, because the complained of conduct could materially impair the poll watchers' unique ability to observe the ballot counts to the point that they would be unable to participate as witnesses in any resulting contest or to ensure confidence in the count, the injury alleged is an injury they alone can have.[21] Were we so inclined, we could inform the parties of our intention to treat the instant appeal as a mandamus application and move promptly to the merits, leaving them with the ability to resolve their differences by agreement in the brief interim. *In re Francis*, 186 S.W.3d 534, 538 (Tex. 2006).

Accordingly, I dissent.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

200560DF.P05

---

[21] While appellees separately contend that they are beyond the reach of the injunctive or declaratory remedy appellants seek, the supreme court has recognized that "an injunction that facilitates the elective process" is proper where it is directed at the officials responsible for it. *Blum*, 997 S.W.2d at 263.